Supreme Court—General Term—First Deartment.

*June,* 1887.

## PEOPLE v. O'NEILL.

AGREEMENT TO ACCEPT BRIBE—ACCOMPLICE—CONFESSION
—EVIDENCE.

The existence of a particular state of mind on the part of a juror in re-
ference to the case or to either party is a proper subject of inquiry, in
order to ascertain whether the juror has actual bias or not.

A witness F. testified to facts which implicated both himself and defend-
ant in the crime of agreeing to receive a bribe. These facts had been
previously stated by the witness to the district attorney, and witness had
been by him promised immunity. Defendant objected to this evidence on
the ground that it was in the nature of a confession given under a prom-
ise of immunity. *Held,* that F's testimony was evidence in chief and
not a confession, and was admissible against defendant.

An objection to evidence which is entirely immaterial and which in no re-
spect had injured the defendant, is unavailing.

An exception specifically taken to a question cannot be claimed to extend to
the entire testimony upon the subject to which this question relates.

If a person desires to show that he was not aware of certain steps being
taken in a litigation to which he was a party, the burden is upon him to
show his ignorance.

Upon a trial for an agreement to take a bride, the prosecution has a right to
show subsequent action of the defendant and his accomplices which was
consistent with the existence of the previous agreement, and from which
the previous agreement might be inferred.

At a meeting of certain aldermen, the defendant being present, one of them,
Jaehne, stated that the Broadway Railroad Company offered $500,000
for their votes. The defendant objected to this evidence on the ground
that the mere statement of Jaehne was not sufficient to prove the fact
that such an offer was really made. *Held,* after discussing the proceed-
ings at the meeting of these aldermen, that the fact that Jaehne was
authorized to make this proposition was reasonably well established by
the evidence that some of his co-conspirators received the sums of
money which fell to their share upon the division of the sum agreed to
be paid.

The receipt of a large sum of money as a bribe gives rise to an inference
that some one had agreed to pay the money to the person bribed.

To convict of agreeing to accept a bribe, the identity of the person promis-

ing the bribe need not be proved. It is sufficient if the agreement to accept a bribe from some person, no matter whom, is proved.

The crime of bribery is just as much proved by showing that the officer bribed does his duty under the influence of a bribe as though he were shown to have violated his duty under the same influence.

A valid exception to the exclusion of a competent question becomes of no avail where such question is permitted to be asked at another stage of the case.

Upon a trial for agreeing to take a bribe it is not error to exclude evidence of defendant's financial condition, resources and income at the time of the alleged offense, there being no claim by the prosecution that defendant at that time exhibited any sudden increase of wealth.

It is entirely within the power of the jury to determine what credit or what belief they shall accord to a witness who has previously sworn to facts inconsistent with his testimony given before them. And the court cannot instruct the jury that they must disregard the testimony of such witness.

It having been proved by accomplices that the corrupt agreement to receive a bribe was made at a certain meeting at a specified time and place, it is proper to prove on the trial of defendant, to corroborate such evidence, that such meeting was held.

It is the duty of the Court only to give the jury instructions upon legal propositions, and not as to the weight they should give to particular parts of the testimony.

While in the case of a confession there must be additional proof that the crime has been committed, in the case of the conviction upon the testimony of an accomplice there must be other evidence tending to connect the defendant with the commission of the crime.

The *corpus delicti* cannot be entirely established by a confession, but it may be established by the testimony of an accomplice.

APPEAL by defendant, John O'Neil, from a judgment of the Court of Oyer and Terminer of New York County. Hon. GEO. C. BARRETT presiding, of 11 February, 1887, convicting him of bribery.

The defendant was indicted at the April session of 1886 of the Court of General Sessions of the Peace, held in and for the City and County of New York.

The indictment, which was in the same form as that in People v. Jaehne, 4 N. Y. Crim. 478, was composed of two counts, the first framed under section 72 of the Penal Code and the second under section 58 of the statute known as the " Consolidation Act " (Laws 1882, ch. 410).

The first count of the indictment is substantially as fol-

lows: That " on the twenty-ninth day of August, in the
year of our Lord one thousand eight hundred and eighty-
four, at the City of New York in the County of New York
aforesaid, a certain petition and application of the Broadway
Surface Railroad Company, a corporation duly organized and
incorporated under and by virtue of the laws of the State of
New York before them duly presented to the Common
Council of the City of New York, praying and making ap-
plication to the said Common Council for its consent and
permission to construct, maintain, operate, and use a street
surface railroad for public use in the conveyance of persons
and property in cars, upon and along the surface of certain
streets, avenues, and highways in the said city," etc. * * *
" was duly pending before and under the consideration of the
said Common Council.

" And the said petition and application having been so as
aforesaid made and presented to the said Common Council
and being so pending and under its consideration aforesaid,
the said John O'Neil, late of the City and County of New
York aforesaid, being then and there a public officer, and a
person executing the functions of a public office, to wit: an
alderman, and a member of the Board of Aldermen of the
City of New York, and as such being then and there a mem-
ber of the Common Council aforesaid, afterwards to wit: on
the said 29th day of August, in the year aforesaid, and whilst
the said petition and application was yet pending before and
under the consideration of the said Common Council, con-
triving and intending the duties of said office, and the trust
and confidence thereby reposed in him to prostitute and be-
tray at the city and county aforesaid, etc. * * * did feloni-
ously ask and agree to receive the sum of twenty thousand
dollars in money, and a promise and agreement therefor from
a certain person whose name is to the Grand Jury aforesaid
as yet unknown, upon an agreement and understanding that
the vote, opinion, judgment, action, and official proceeding
of him, the said John O'Neil, as such member of the Common
Council aforesaid, upon and concerning the said petition and

application of the said Broadway Surface Railroad Company, so pending before and under the consideration of the said Common Council as aforesaid, should be thereby influenced, and that his vote, opinion, judgment, action and official proceeding as such member of the Common Council aforesaid upon and concerning the said petition and application, should be in favor of the granting and giving by the said Common Council of the consent and permission so as aforesaid in and by the said petition and application prayed and applied for against the form of the statute," etc.

On the 24th day of January, 1887, the defendant was arraigned in the Court of Oyer and Terminer, of the County of New York. The second count of such indictment was formally abandoned by the people, and the trial ensued upon the first count thereof only.

After a protracted examination of proposed jurors, occupying several days, a panel of twelve was ultimately selected.

Ludolph A. Fullgraff and Michael Duffy, testified on behalf of the prosecution in substance that as members of the Board of Aldermen and Common Council of 1884, they combined and conspired with the defendant to grant the franchise prayed for to the Broadway Surface Railroad Company, and that as a result of such combination and conspiracy and incident thereto, the defendant as well as themselves agreed to receive and accept the sum of twenty thousand dollars each to influence their votes and action in favor of the granting of such franchise to the said Broadway Surface Railroad Company.

The witnesses Fullgraff and Duffy each severally testified, that prior to their acceptance by the District Attorney as witnesses for the people, promises, inducements and statements were held out and made to them, (see Point II. of appellant's brief), in consequence of which they each made statements to that officer, while in custody of an inspector of police, which statements substantially formed the evidence they gave upon the trial of this case.

At the times of the making of these promises Fullgraff and

Duffy was in custody for charges entirely apart and distinct from the defense charged in the indictment against this defendant.

Upon its appearing in the testimony that such evidence was thus procured, and under these circumstances presented against the defendant, his counsel moved as follows :

" That all the testimony of these witnesses * * * be stricken out for the reason that the statements and declarations of the witnesses were in the nature of confessions, and that they were induced by promise of immunity and reward, as well as by threats and through fear, and are therefore incompetent and inadmissible." This motion was denied and an exception thereupon duly taken.

Fullgraff and Duffy also testified, that some time prior to their having been arrested or indicted for any offense concerning their actions as members of the Board of Aldermen, they were summoned to appear before a Committee of the Senate of the State of New York, duly appointed under a resolution of such Senate, empowering and charging said committee to investigate the various matters connected with the granting of such franchise to the " Broadway Surface Railroad Company," and involving the same inquiries and evidence made and presented in the trial of this indictment ; that upon their appearance before such Senate committee and before giving their testimony they were severally in due form sworn to tell the truth, under the same form of oath as that administered to them upon this trial ; that after such oath was administered they each testified in substance that they knew of the existence of no combination whatever in the Board of Aldermen to corruptly give such franchise to the " Broadway Surface Railroad Company ; " that they had never been offered, nor had agreed to receive, or had received, any bribe, reward or inducement whatever to vote in favor of the granting of such franchise, nor did they know of any such bribe, inducement or reward having been offered, agreed to be given, or received, or having been received by any mem-

ber of said Board of Aldermen for or in connection with any such purpose. They further testified that before such Committee of the Senate they had sworn that in giving their votes, and in all their actions and proceedings respecting the granting of such franchise to said "Broadway Surface Railroad Company" they had been actuated by only honest and proper motives; that they were impelled so to vote and act by the belief that the best interests of the community were served in so doing, and that they were obeying the wishes and desires of their several constituencies thereby.

They were closely interrogated on the present trial as to the reasons for such conflict, and thereupon testified that what they had sworn to upon all these material matters before such committee was false, and that in so swearing they had committed perjury.

The testimony of Fullgraff and Duffy substantially was, that about the time of the passage of the Surface Railway Act, in May, 1884, there had been an informal meeting in the ante-room of the Aldermanic Chamber of certain members of the Board, at which some suggestion was made to the effect, that with respect to railroad matters, irrespective of party politics, there should be a combination of the majority of the Board, to stand together in their actions and votes; that at such preliminary meeting (as it was termed), there not being enough members present to constitute a majority of the Board, it was suggested that a subsequent meeting should take place at Fullgraff's place of business, which meeting did, in accordance with such suggestion, subsequently take place thereat, and at which there were present thirteen members, constituting a majority of the Board of Aldermen. That the advisability of forming such combination was agreed upon, and that it was then and there agreed that all of the persons present should thereafter act in concert respecting railroad matters. That subsequently other meetings of the same thirteen were held at the house of Alderman Mc-Loughlin, a member of the Board, and who was chairman of the meeting at Fullgraff's place of business. That at such

meetings, it having been stated by Aldermen De Lacy and Jaehne that the Cable Railway Company and the Broadway Surface Railroad Company had each offered certain sums of money as inducements to the Common Council to grant them the franchise sought; and it having been determined to accept the offer of the Broadway Surface Railroad Company of $500,000 in cash for such franchise; subsequent discussion ensued as to how much of such sum each member of the combination should receive as his share, and that twenty thousand dollars each was the amount which they among themselves finally agreed to accept. They further testified that at all of such meetings except the preliminary one, the defendant was present and acquiesced in the proceedings.

At the close of the case for the people, the defendant's counsel moved in substance that the jury be advised to acquit, for the reason that there was no proof of any such agreement as was charged in the indictment, inasmuch as there must necessarily be two parties to an agreement. Here was simply " an agreement to receive. There must be a corresponding agreement to give." The thirteen aldermen, according to Fullgraff and Duffy, " agreed together to vote upon all matters connected with the Broadway franchise, and to *receive a certain sum of money* ; there is not a particle of evidence that anybody *agreed to give* them a certain sum, or that they agreed with anybody to give them anything. The agreement was imperfect, incomplete, and unconsummated."

This motion was denied, and an exception duly taken.

Fullgraff and Duffy testified that the meetings held at McLoughlin's house, having relation to the agreement of the thirteen to accept the bribe referred to, all took place in the latter part of May or the early part of June. The defence called several witnesses who gave evidence tending to show that no such meetings as sworn to by Fullgraff and Duffy took place.

To corroborate the evidence of Fullgraff and Duffy, the prosecution produced as a witness Katie Metz, a servant girl,

who at the time of the alleged meeting of the thirteen aldermen at the house of McLoughlin, that is, in the months of May and June, 1884, lived next door to that house.

She testified that in the months of May and June, 1884, between 8 and 9 of the evening upon answering a ring at the front door she found four or five gentlemen asking for Mr. McLoughlin, that she pointed out to them McLoughlin's house, which was next door, and saw them enter it; that a few moments afterwards there was another ring at the door and more persons came asking for McLoughlin. Witness directed these also to go next door, and saw them enter that house. The witness testified that upon another occasion in the same months the same persons, or some of them, went into McLoughlin's house by twos and threes, and they came out in the same manner. Witness testified that their comings and goings occurred on two or three occasions.

Upon being shown a copy of the *Daily Graphic* of May 10, 1886, containing portraits of some of the aldermen of 1884, witness recognized five of the portraits of the aldermen, among others that of the defendant, as among those who were present at these meetings at McLoughlin's house.

Another witness, Harriett Massett, the employer of the previous witness, testified she was in the dining room when the first ring came upon the first occasion testified to by the witness Metz: "I was in the dining room sitting there after dinner. I heard her come down and heard somebody laughing. I said nothing about it. In a few minutes there came another one to the door for McLoughlin and I said, 'McLoughlin, I wished the alderman lived elsewhere.'"

The Board of Aldermen having on August granted the franchise asked for to the Broadway Surface Railway Company, the Mayor vetoed the resolution granting this franchise. Thereafter an action was commenced by one John H. Lyddy, an alleged inhabitant and taxpayer of New York city, to restrain any further action of the Board of Aldermen upon the petition of the Broadway Surface Railroad Company, and for further relief, and in this action a temporary injunction was granted on an order to show cause.

The Broadway Surface Railroad Company paid plaintiff twelve thousand dollars on 29 August, 1884, for a discontinuance of this action, and the same evening an order was signed discontinuing the same.

Late in the afternoon of that day, William H. Moloney, the acting recording clerk of the Board of Aldermen, with a prepared call for a meeting of the Board for 9 o'clock in the morning of 30 August, called upon a number of the members of the Board of Aldermen, among others the defendant, and procured their signatures to that call.

On the 30th of August at 9 A.M., which was an unusual time for the holding of meetings, the aldermen proceeded with locked doors under circumstances implying their desire for secrecy, to pass resolutions granting the franchise to the Broadway Surface Railroad Company.

Subsequently that meeting of the Board having been declared to be illegal by the Corporation Council, a meeting was held on December 5, 1884, at which the Board of Aldermen again granted the franchise to the Broadway Surface Railroad Company.

The defense offered to prove by constituents of the defendant the public sentiment in favor of the granting of the franchise referred to, but the Court would not permit such evidence to be presented, unless each individual had either communicated his desire personally to the defendant, or had joined in some public demonstration in his Aldermanic District in favor of such a measure.

*Peter Mitchell* and *Chas. W. Brooke* for defendant, appellant.

1. The Court erred in permitting jurors to be examined as follows: George H. Bend, called as a juror, in the examination as to his competency, was asked the following question:

" The prosecution proposes to call as witnesses two persons who were members of the Board of Aldermen of 1884, and who have turned State's evidence, and the prosecution proposes to use those persons as witnesses in this case, and it

is supposed that they will testify that they were engaged with this defendant in the transaction out of which this indictment arose. Does your prejudice against persons so testifying amount to so much that it would prevent you from giving their evidence, whatever weight it might be entitled to in law?"

This was objected to as immaterial, irrelevant and incompetent; which objection was overruled and exception taken.

The defendant was a member of the "Board of Aldermen of 1884;" the proposed juror had been apprised that the charge against him in which he was expected to be impanelled was that of bribery, the allegation being that he the defendant had agreed to accept a bribe to influence his vote and action as a member of such board in favor of the granting of the franchise referred to to a particular corporation. Therefore the insinuation is that as the associate of the defendant in the "Board of Aldermen" the "two persons" were in confidence and accord with the defendant.

"*Turning* State's Evidence" instantly conveys to the mind of the juror, first that the crime charged has in fact been committed; that the "two persons" joined with the defendant in its commission; that they have "*turned*" from the defendant since the commission of the crime; that the prosecution has heard from them the *true* evidence of the defendant's guilt, and *it* having accepted their story, the *juror* is in duty *bound* to do so.

They were members of the "Board of Aldermen of 1884;" they have "*turned*" State's evidence; the prosecution "*propose*" to call them as witnesses; why? "*they were engaged with the defendant in the transaction out of which the indictment arose.*" What transaction? *The agreement to accept the bribe charged.*

Upon the statement of the proposition of the District Attorney, the "two persons" whom he p... ,posed to call, would take the stand in the attitude of accomplices.

The law distinctly declares that the testimony of such persons is entitled to *no weight whatever*. The testimony of an accomplice cannot even for a moment be considered by a jury, unless *independently* of it, there be such corroborative proof as shows " a crime to have been committed, and the " defendant connected therewith."

Whatever of prejudice there is " against persons so testifying," is a prejudice created by the law, the citizen is bound to share it; the possession of it, is an indication of his fitness to act his part as a juror in all cases where in the progress of a trial accomplices are called to testify.

With varying phraseology this same inquiry was pursued in the case of every proposed juror.

The Court erred in denying the motion to strike out the testimony of Ludolph A. Fullgraff upon the ground that such testimony was in the nature of a " confession, and was induced by promise of immunity and reward, as well as by threats and through fear, and was therefore incompetent and inadmissible."

This witness testifies in his examination in chief, that he was arrested to answer an indictment charging him with bribery in connection with his vote and action upon the granting of a railway franchise to the " Thirty-fourth Street Railroad " Company" in October, 1885. That upon his arrest he was taken to the " Central Office" to the " Inspector's room;" that he there saw the Inspector, Mr. Martine ( the District Attorney), and Mr. Nicoll (Assistant District Attorney). Mr. Martine there told him " he had the evidence to " convict him," and showed him the statement of Duffy, and he " became convinced there was truth in it." Mr. Martine said that Duffy " had made a statement in connection with the Broadway Railroad and the Thirty-fourth Street Railroad," and the witness stated that he wanted time to consult with his family. Mr. Martine agreed that he should go home, in the custody of two officers, which he did, and thereafter went to Mr. Nicoll's house on Twenty-seventh street, where he saw Mr. Byrnes, Mr. Martine and Mr. Nicoll; that

he had a conversation with Mr. Martine in a room apart from the others; that Mr. Martine told him that the District Attorney would give him immunity in case he testified. After which he went into the room where Mr. Nicoll, Mr. Byrnes and Mr. Martine were, and made a statement to them of his " connection with the Broadway Surface Railroad matter from the beginning to the end."

On his cross-examination the witness stated as follows: " Mr. Martine told me that it would be best for me to make a statement about the transactions in the Board of Aldermen, and that the evidence was so strong against us that there would be no doubt of conviction, and also showing me—giving me some of the evidence that left no doubt in my mind that he had the evidence."

The witness further said in substance that the immunity promised him embraced all matters with which he was connected while in the Board of Aldermen; and that the evidence he had given in this case in relation to the informal meeting in the Aldermanic Chamber, the meeting at his factory, and all of the meetings at McLoughlin's house were matters embraced in, and parts of the statements made to Mr. Martine after he had promised him immunity and after the evidence the witness referred to had been shown to him by the District Attorney.

Unquestionably, if Fullgraff himself were on trial under such circumstances, the confession referred to would have been clearly inadmissible and incompetent as against *him.* Could such confession be properly admitted, having thus been extorted to bind and affect his alleged accomplice?

It should be borne in mind that the substantive offense charged in the indictment was alleged in the evidence to have been the result of a " conspiracy" in which the witness, the defendant and others were asserted to have been co-conspirators. The concert essential to the constitution of conspiracy made the act of one the act of all. The elementary rule in the establishment of conspiracies is, that the conspiracy must first be established, before the acts and declarations of

one conspirator can be received in evidence to affect his co-conspirators. This confession of Fullgraff's assumes to in fact establish the conspiracy as well as to establish the acts and declarations of those associated with him in the unlawful combination. His confession, therefore, should be regarded as the confession of his fellows, and, therefore, it seems to be at least but a just and fair application of the rule, that if it were not voluntary in its character, but extorted as is demonstrated, it should have been excluded as incompetent, or the motion to strike it out, when the circumstances which induced had appeared, granted.

The law excludes confessions either induced by promises or extorted by threats and through fear, because it esteems them as unreliable. Thus, it will be readily observed, the objection it entertains to their admission under such circumstances goes to the character of the evidence itself. It is incompetent *per se*, and the mind having been once placed under the dominion and influence of the promise or the threat, the competency of such evidence is forever destroyed. What was the situation of the witness here? He had been promised immunity from what, from the consequences of his participation in the very offense for which the defendant was in jeopardy, he had been threatened unless he testified against the defendant, he should himself be tried and convicted of the very offense he was charging against the defendant. "When confessions are extorted by hope or fear, they cannot be given in evidence against the prisoner *or anybody else*." *Berry* v. *State*, 10 Ga. 511. "If it appears that any inducement was held out tending to extort a confession either by intimidation or promise of favor, such confession *cannot be received*. *Commonwealth* v. *Chabbock*, 1 Mass., 144; *Commonwealth* v. *Drake*, 15 Id., 161; *Commonwealth* v. *Knapp*, 9 Pick., 496; *State* v. *Grant*, 22 Maine, 171; *State* v. *Phelps*, 11 Vt., 116; *Stephen* v. *State*, 11 Ga., 225; *State* v. *Jenkins*, 2 Tyler, 379; *State* v. *Brick*, 2 Humph., 39; *Hector* v. *State*, 2 Mo., 135; *People* v. *Ward*, 15 Wend., 231; *Oakley* v. *Schumaker*, Id., 226; *Smith* v. *Commonwealth*, 10 Gratt. 734. "Public policy requires

the exclusion of confessions obtained by means of inducements held out by persons in authority." 1 Wh. Am. Crim. Law. §§ 686, 481 ; *R.* v. *Upchurch*, 1 Moody C. C., 496 ; *R.* v. *Drew*, 1 C. & P., 140.

" A confession *is not admissible in evidence* where it is obtained by temporal inducement, by threat, promise, or hope of favor held out to the party in respect of his escape from the charge against him by a person in authority, or where there is reason to presume that such person appeared to the party to sanction such a threat or inducement." *State* v. *Bastick*, 4 Harrington, 465 ; *R.* v. *Jones*, Russ. & Ry. C. C., 152 ; *R.* v. *Jenkins*, Id., 492 ; *R.* v. *Hearn*, Carr. & M., 109 ; *R.* v. *Parrot*, 4 C. & P., 570 ; *R.* v. *Thompson*, 1 Leach C. C., 4th ed., 291 ; *State* v. *Roberts*, 1 Dev., 259 ; *Commonwealth* v. *Hartman*, 4 Baw., 259 ; 2 Russ. on Crimes, 832 ; *State* v. *Guild*, 5 Halstead, 163 ; *Boyd* v. *State*, 2 Humph., 39.

While is true that the confession or declaration of any accomplice or confidant made *when they were in the act of committing an offense, or when its way of commission* can be received in evidence, yet such confession, under such circumstances, must be voluntary, and free from inducement or threat, to make it admissible.

" After the commission of the act is complete and over, declarations subsequently made by an accomplice are good evidence against him only, unless made in the present of his partners in crime." Hunter's Case, 7 Gratt, 641.

III. The Court erred for the same reasons as suggested in the preceding point, in refusing to strike out the testimony of Michael Duffy upon the defendant's motion made upon the ascertainment that such testimony was likewise a mere " confession" made to the District Attorney while in custody, and in the presence of the Inspector of Police, who held him in duress—and which confession was induced and extorted by the same promises and threats as those resorted to in the case of Fullgraff.

IV. The Court erred in permitting Charles B. Waite, also uerdn the evidence presented by the people, " an accomplice,"

to testify to occurrences at the office of the Broadway Surface
Railroad Company during the summer of 1884. Such occur-
rences being in the absence of the defendant, and without the
slightest proof that he had any knowledge whatever thereof,
or that the same had ever at any time been communicated to
him.

This witness having testified that he was a member of the
Board of Aldermen of 1884, and a member of the Railroad
Committee of such Board. That he knew James A. Rich-
mond, the President of the Broadway Surface Railroad Com-
pany well; that he lived at the same hotel with him, and
saw him almost every day, and he had many conversations
with him on the subject of the Broadway Surface Road, was
further interrogated as follows :

" Q. Where was the office of the Broadway Surface Road ? "
" A. 150 Broadway." " Q. In whose office was it ? Where
was it located in 150 Broadway ? " " A. It was a room in
the office of the counsel of the company, Scribner & Bright."
" Q. Were you at any time at that office ? " " A. Yes, sir."
" Q. Were you frequently or seldom at the office of the rail-
road company during the summer of 1884 ? "

Objected to as immaterial and improper ; objection over-
ruled ; exception.

" A. *I was there quite frequently.*"

" Q. Now after the 30th day of June, and up to the *5th
day of December*, were you frequently or seldom at the office
of Scribner & Bright ? " " A. Seldom during the summer,
*more frequently during the fall.*" " Q. And during any of
the occasions that you were there, whether in the summer, *or
in the fall*, did you see William H. Maloney there ? " " A. I
saw him there." " Q. Between those dates ? " This was
formally objected to upon the ground additionally that what
other persons did who were not charged to be parties to the
conspiracy assumed, even in consequence of the formation
of such conspiracy, was inadmissible. The objection was
overruled by the Court, and an exception taken.

The entire evidence as to what Moloney did at the office of

the Broadway Railroad Company, and at the office of the counsel for that company, embracing every occurrence at either place which was admitted in the course of the trial, subject this to exception, should be considered as embraced within such exception.

There was not in the entire case even an attempt to introduce testimony indicating in the remotest manner that the defendant had ever had the slightest communication with Moloney upon the subject of the Broadway Railroad franchise; or that the defendant either knew any of the counsel for the road or any person connected with the Broadway Surface Railroad Company; or that he had ever been either in the office of such counsel or in the office of said company; or that he had the least knowledge of even the fact of the acquaintance of Moloney with any such persons; or of Moloney's presence at any time in either of such offices; or that he had any knowledge whatever either of the witness Waite's acquaintance with any such persons, or of his visits to either of such offices; or that Waite or anybody else had ever communicated to him any of the occurrences or circumstances referred to, or that he had ever had any communication whatever between the witness Waite upon the subject of the Broadway Railroad franchise.

V. The Court erred in admitting the evidence of Charles B. Alexander, a witness called for the people, who was permitted to testify concerning negotiations and settlement of the suit of John H. Lyddy against the Mayor, Aldermen and Commonalty of the City of New York.

This witness testify that he was a " counsellor-at-law," and that he was retained by the President of the Broadway Surface Road in the suit above referred to ; and was then interrogated as follows :—Q. " Did you negotiate a settlement of that suit with the plaintiff or the plaintiff's attorney on behalf of the Broadway Railroad ? " A. " Yes." Q. " That is, with whom personally did you negotiate ? " Objected to as immaterial, incompetent and irrelevant, and as not having anything to do with this case; objection overruled; exception.

The witness was then permitted to testify that he effected a settlement of that suit with the plaintiff's attorney; that he obtained from the plaintiff a consent to a discontinuance; that when he obtained such discontinuance he made some payment to the plaintiff; that when he obtained the consent to a discontinuance he gave them to Mr. Bright or Mr. Richmond, who were together; that he (the witness) "was acting on the retainer of the President of the Broadway Surface Road," and that such consent was obtained from the plaintiff and delivered to Mr. Richmond or Mr. Bright, on or about the 29th day of August.

There was no evidence in the entire case that the defendant had any knowledge whatever of any of the circumstances connected with the suit referred to beyond the mere fact that, as a member of the Board of Aldermen, he knew that an injunction had been granted restraining its action. As to the interest taken in the dissolution of the injunction by the Broadway Surface Railroad Company, its retainer of Mr. Alexander, the subsequent occurrences as between Mr. Alexander and Mr. Bright and Mr. Richmond, the payment of money to the plaintiff to procure the discontinuance or of any of the matters connected with the negotiations between the persons referred to, there was not a particle of evidence that he had the slightest knowledge or information respecting any of such matters, and it was not pretended that he was in anywise a party thereto. The inference of the jury, however, from the fact of the testimony having been permitted as competent against the defendant, and submitted to them upon his trial, could not have been otherwise than to induce a belief in their minds that such occurrences and matters were within his knowledge, had his approval, and were in furtherance of the corrupt purpose and conduct imputed to him by the charge in the indictment.

The evidence itself indicates that the occurrences to which it relates all took place in the absence of the defendant; nor does not it appear that even the existence of the defendant and witness was known to each other.

VI. The Court erred in admitting evidence of transactions subsequent to August 30, 1884, the day laid in the indictment as that upon which the offense is alleged to have been committed.

The District Attorney had offered in evidence certain printed " proceedings of the Board of Aldermen," having reference to matters connected with the Broadway Railroad franchise, so far as such documentary evidence related to proceedings, prior to and including the 30th day of August, 1884, they were not objected to, but upon his proposal and offer to read from the proceedings of September 1, 1884, his doing so was objected to " as immaterial and incompetent," and the reason for such objection thus farther stated on the record :— " It appears from the testimony of the people, that whatever there is of offense imputed to this defendant under the indictment, must have been consummated and completed on August 30, and any testimony of what occurred subsequent to that date is objected to as incompetent, irrelevant and immaterial." Objection overruled ; exception taken. " The indictment charges that the defendant corruptly did *agree to accept and receive* a bribe to influence his " vote, action, judgment, opinion and official proceeding on the 30th day of August, 1884." It was the right of the people to show that upon any day prior to the 30th day of August, and within six years from the date of the finding of the indictment, that he had been guilty of the act charged ; but no evidence was competent or admissible as to any commission of such offense subsequent to that date. The only testimony competent as to matters occurring after the 30th day of August, 1884, was first—His voluntary confession of his guilt; second—Possession of the fruits of the offense charged.

The evidence submitted by the people to prove its accusation was in relation to this branch of the case, solely that of Fullgraff and Duffy. They testified that at the meetings in McLoughlin's house in the latter part of May or early in June, 1884, the combination was perfected, the agreement to accept the bribe completed and settled. Whatever offense

there may have been committed under this indictment was therefore committed and completed in June, 1884. The indictmont, it will be remembered, is for an *agreement to accept* a bribe, not for the consummated offense of bribery. Even had the defendant agreed on the 10th day of June to receive a bribe which another had agreed to give him, and on the 11th day of June had repented and repudiated his agreement, still his offense, under this indictment and this law, would have been complete, and his subsequent repentance and withdrawal could only upon conviction be considered in mitigation of his punishment.

Whether the defendant did or did not in fact attend the meeting of the Board of Aldermen and vote in favor of the granting of such franchise to the Broadway Surface Railroad Company is a matter of no great materiality or absolute importance. The only significance that circumstance has, the only reason for its competency, is, that his presence and vote in favor of that measure might indicate in some degree that they were induced by reason of the agreement he had previously made, and tend to establish that agreement.

VII. The court erred in denying the defendant's motion at the close of the people's case to advise the jury to acquit the defendant upon the ground that no such agreement had been proven as the law requires to be established, before a conviction could be properly had upon this indictment.

As has been already stated, the only witnesses who testified concerning an alleged formal agreement to accept and receive a bribe, and who assumed to detail any circumstances connected with such an agreement were Fullgraff and Duffy, and their evidence did not prove the existence of an agreement.

What if the testimony were even reliable (and so considering it for the purposes of discussion), is the inference to be drawn from it? Jaehne asserted that the Broadway Surface Company "offered" $500,000 "for the franchise." No authority for any such statement, no suggestion of any communication emanating from that company, no divulging of the

name of any person in its authority who had made the "offer;" what then is the inference?

VIII. The court erred in excluding the testimony sought to be solicited from Edward L. Merrifield, a witness called for the defense, who since 1876 had been the proprietor of the Continental Hotel at Twentieth street and Broadway, where he resided, and which was in the Aldermanic district of the defendant, whose constituent he was; as to whether he favored or opposed the construction of a railroad on Broadway, and whether he regarded such construction as an advantage or benefit to the property owners and business people on the line of the railway, and of advantage and benefit or otherwise to the citizens of New York, and also in excluding similar evidence of Robert B. Roosevelt.

IX. The court erred in excluding the testimony of the defendant as to "his object and purpose of voting" for the granting of the franchise to the Broadway Surface Railroad Company.

X. The court erred in excluding from evidence the books of the defendant's business, offered to show the extent of his income and possessions, and to rebut the assumption that he had benefited by the receipt of any unusual sum of money, either by way of bribe or otherwise within the period covered by the case of the prosecution or at any time thereafter, down to the time of his trial.

XI. The learned judge erred in charging the jury as follows:

"Even if the jurors have a positive antipathy to such persons" (Fullgraff and Duffy), "they are bound to yield this spirit at least to the extent of submissively bowing their heads to the law, and of receiving, examining, considering, and judging of the quality of the testimony. For instance, gentlemen, in any case of a similar kind, should a juror, after hearing all the evidence, say to himself: 'I am satisfied this corrupt agreement has been made, or this corrupt transaction took place, but I will not so declare because the evidence in part is tainted, is of such a character that I loathe the wit-

nesses who gave it, and I do not choose to send a man to state prison on evidence of which, even in part, I disapprove; yet I am satisfied of his guilt.' Such a juror would disregard his duty and subvert the law."

This, it is submitted, was not only calculated to mislead the jury, but is manifestly error. It is not sufficient that a juror should be "satisfied that the corrupt agreement was made, or the corrupt transaction took place," it must so clearly be demonstrated by conclusive, truthful and reliable. evidence. A juror may be *morally* satisfied of such facts, yet the evidence may fail to establish them; and, inasmuch as he is bound to decide the case only according *to the evidence*, it would become his sworn duty in such a contingency to yield his moral satisfaction, and finding the case not legally proven to find his verdict for the defendant; especially would this be so, if the evidence was "in part tainted or of such a character" as to excite his loathing for the witnesses who gave it. The juror would discharge his full duty if he refused "to send a man to state prison on evidence "of which even in part he disapproved," no matter how much he might be morally satisfied of the fact of defendant's guilt. He would assuredly "subvert the law" if he, by his verdict, sent a man to "state prison upon evidence. which was tainted and of which he conscientiously disapproved."

XII. The court erred in charging the jury as follows:

"Had they (Fullgraff and Duffy) any motive for here testifying to their own and defendant's guilt? That is for you to say, and it is for you to say what bearing that question of motive has upon the inherent probability of what they say. The claim of the prosecution is, that they denied while there was hope, and confessed when they were hopeless. It is for you to say whether that is the truth of the case or not. Then, gentlemen, you are at liberty within the meaning of the law to disregard this testimony, but do not misunderstand my words, *you are not at liberty to disregard it if you really* believe it to be true. You have not the license to disregard it, you are at liberty to do so."

The Court seemed in this connection to have lost sight of the fact, that inasmuch as Fullgraff and Duffy were upon their own admissions " accomplices," their testimony was entitled to no consideration whatever, unless the jury should find that was sufficiently sustained and corroborated by other and independent testimony.

XIII. The Court erred in further charging the jury with regard to the testimony of Fullgraff and Duffy, as follows:

" So, after all, it comes to this ; you have heard the testimony, you have noted its elaborate character, you have watched the witnesses under cross-examination, you have weighed motives, probabilities, circumstances, facts ; having done all this, you will place your hand upon your heart and say whether, upon the whole, you think these witnesses have spoken the truth here , and if they have, it will be your duty to so declare."

This seemed to be rather an instruction to find for the people, than a mere charge of the Court upon the law as applicable to the facts of the case. It characterized the evidence given by the self-asserted accomplices as " elaborate," it indicated the particular attention given to the witnesses under cross-examination, it intimated that they came unscathed through the fires of such cross-examination, it informed the jury that they had already weighed motives, probabilities, circumstances, facts ; and having done all this it seemed to leave nothing in addition for the jurors to do, but to place their hands upon their hearts and declare the accomplices to have spoken the truth, convict the defendant." *Mc Kenna,* v. *People,* 81 N. Y. 361 ; *Read* v. *Hurd,* 7 Wend., 409 ; *Fitzgerald* v. *Alexander,* 19 *Id.,* 402; *Bulkley* v. *Keteltas,* 6 N. Y., 384 ; *Stokes* v. *People,* 53 N. Y., 164.

XIV. The Court erred in charging the jury with respect to the evidence of Katie Metz, as follows :

" Now, gentlemen, if this girl identified some of the Alderermen, though not this defendant, it will be for you to say

whether that affirmative testimony, if true and accurate as to such partial identification, does not corroborate these stories of meetings, as we say in law *pro tanto*, that is, to that extent. In other words, whether her testimony does or does not tend to corroborate the general story of Fullgraff and Duffy to the effect that there were meetings of the corrupt character that were specified."

In other words, that the jury should say, if they relied upon her assumed identification of the persons entering the house, that it corroborated the story of Fullgraff and Duffy as to all that took place within.

XV. The Court erred in refusing to charge the jury as duly requested by the defendant's counsel, as follows : " Where a witness is proven either upon the trial of the case pending, or in some case involving the same subject matter to have committed wilful perjury, the jury should utterly disregard his testimony."

Fullgraff and Duffy had both testified that they were summoned to appear and were examined upon oath by a committee appointed by the Senate of the State of New York to investigate the matters concerning the Broadway Surface Railroad Company, and the action of the Board of Aldermen in granting them the privilege to construct the railroad upon Broadway. Before that tribunal they testified in every material incident and particular, in a long, detailed, elaborate and thorough examination, to a narrative and statement so opposite and in conflict with the story told by them in the trial of this case as to render almost every portion of it wholly inconsistent and irreconcilable. Their examination embraced every detail of the proceedings of the Board of Aldermen respecting its action with regard to this franchise. It extended to a full inquiry as to whether there had been any combination of members of the Board to corruptly act in the passage of the measure. Whether they had been personally in any manner corrupt in their participation in such proceedings. Whether they had been offered or received, or agreed to ac-

cept any bribe or inducement whatever as an incentive to their action ; whether they had any knowledge or information concerning such conduct upon the part of others, and as to their motives and reasons for favoring and voting for the granting of the franchise to the particular corporation which received it.

The refusal of the Court to charge upon the proposition was absolute error. *People* v. *Evans,* 40 N. Y. 1 ; *Pease* v. *Smith,* 61 N. Y. 483 ; *Deering* v. *Dunlap,* 74 N. Y. 503 ; *Dunn* v. *People,* 29 N. Y. 523 ; *People* v. *Petmecky,* 3 N. Y. Crim. 288. *Dunlop* & *Meigs* v. *Patterson,* 5 Cow, 243, 247, *Moett* v. *People,* 85 N. Y., 373; The Santissima Trinidad, etc., 7 Wheat., 338, 339 (Story, *J.*). *Heuber* v. *Teuber,* 3 McArthur ( D. C.), 485 ; Starkie on Evidence, 873 ; *Sanders* v. *Leigh,* 2 Hav. McH., 380 ; Best on Presumptions, 47 Law Lib., 206.

*Randolph B. Martine,* district attorney, *De Lancey Nicoll,* assistant, for the people respondents.

VAN BRUNT. P. J.—Various grounds of error have been assigned by the defendant upon this appeal, which grounds relate to the method of the examination of jurors as to their competency, to the admission of evidence, to the denial of motions to strike out evidence, and to the charge of the court.

It is urged upon the part of the defendant that the only inquiry as to the competency of jurors which can be made, relates to the fact as to whether they stand indifferent as between the people and the defendant, and that the peculiar nature of the evidence upon the part of the prosecution, or of the defense upon the part of the defendant cannot be called to the attention of the juror for the purpose of ascertaining whether in view of such evidence or such defense the juror is without bias.

It does not seem at all necessary to discuss this proposition in view of the decision of the Court of Appeals in the case of the *People* v. *Carpenter* (102 N. Y. 239 ; 4 N. Y. Crim. 177 ;)

where the existence of the state of mind on the part of the juror in reference *to the case* or *to either party* is expressly held to be a proper subject of inquiry in order that it may be ascertained as to whether the juror has actual bias or not.

It was claimed upon the part of the defendant that the court erred in denying the motion to strike out the testimony of the witness Fullgraff upon the ground that such testimony was in the nature of a confession and was induced by the promise of immunity and was therefore incompetent and inadmissible.

It is undoubtedly true that a confession induced by promise of immunity and reward cannot be introduced in evidence as against the party making the confession. But no rule of law has yet been established to the effect that an accomplice is not a competent witness on behalf of the prosecution for the purpose of aiding in establishing the case against the defendant. The testimony of Fullgraff was in no sense a confession. It was his deliberate statement upon the stand. He was being examined as a witness, and as a witness he testified. It is undoubtedly true that under the circumstances of the case his evidence could not be used as against himself : but it is difficult to see why his evidence was not competent as against the persons who were engaged with him in the commission of the crime for which the defendant was indicted.

It would seem from the authorities cited in support of this proposition by the learned counsel for the defendant that they have misapprehended the distinction between the evidence of a confession and evidence in chief. The testimony of Fullgraff as has already been said was in no respect a confession. It was the testimony of a witness given upon the stand voluntarily. It is true that Fullgraff might have refused to answer the questions put to him upon the ground that he might criminate himself, but answering as a witness, his evidence was entitled to go to the jury to be given by them such weight as the evidence itself and the character of the witness justified.

The objection to the evidence of Charles B. Waite seems

to be without force, because his evidence as far as objected to was entirely immaterial and in no respect could have possibly injured the defendant.

The claim that such exception covers the entire evidence as to what Maloney did at the office of the Broadway Railway Company, and at the office of the counsel of that company cannot be sustained, because the exception did not pretend to extend its effect any further than to the questions which had previously been asked, and to which the exception had specifically been taken.

The objection to the evidence of C. B. Alexander is equally without force, because his testimony related to the settlement of a suit to which the defendant O'Neill was a party. The defendant was one of the aldermen of the city of New York, and the mayor, aldermen and commonalty were parties to that litigation. The injunction granted in that action restrained them from acting, and immediately upon the settlement of the litigation, the defendant appeared at the meeting and voted. It is to be presumed that he must have heard of the dissolution of the injunction rather than to assume that by his action he intended wilfully to violate the order of the court. O'Neill being a party to this litigation, all evidence of its conduct and management was competent, and if he desired to show that he was not aware of those steps being taken in the litigation to which he was a party, it was for him to show his ignorance.

It is further urged that the court erred in admitting evidence of transactions subsequent to August 30, 1884, the date laid in the indictment as that upon which the offense is alleged to have been committed. It is a familiar rule of evidence that from subsequent action a jury has a right to infer the existence of a pre-existing fact. For example, the declarations and conduct of two men may be received in evidence for the purpose of showing that at some prior date an agreement of copartnership was entered into between them.

So, in the case at bar, for the purpose of showing the previous agreement in reference to the subject-matter of this in-

dictment the people had a right to show the subsequent action of the defendant and his accomplices which was consistent with the existence of the previous agreement, and from which the previous agreement might be inferred; because upon proof that a man has taken a bribe, it will not be difficult to infer that he had agreed to be bribed.

The claim made upon the part of the defendant's counsel that there was no proof establishing the crime such as the law requires before a conviction could be properly had upon this indictment, seems to be founded upon the fact that there was no proof in the evidence other than Jaehne's assertion that the Broadway Surface Company offered $500,000 for the franchise, and there being no proof of authority for any such statement, nor suggestion of any communication emanating from the company, and that therefore no inference could be drawn that any such offer had been made upon the part of the Broadway Surface Company, but rather that it was an attempt on the part of some of the aldermen to form a combination for the purpose of compelling illegally and corruptly the payment of money to them, and that this pretence of an offer was a part of their scheme to collect money from these railroads, and that they sought to secure the co-operation of their fellows through the means of these representations.

It seems, when we consider the nature of this meeting, the object for which it was called together, the circumstances surrounding the parties and the statements which were made in regard to the offers of the various rival companies, that each one of these men who participated in this meeting understood these statements to be made by and with authority at the time they were made ; and that their agreement to accept the $500,000 being $22,000 apiece for each of their votes was understood between these parties to be the acceptance of a *bona fide* offer for the purchase of their votes, especially taken in connection with the discussions at the subsequent meeting at which a treasurer was appointed, and the meeting at which the amount to be received was reduced in

consequence of certain expenses which were required to be paid out of the money. The fact that Jaehne was authorized to make this proposition seems to be reasonably well established when we consider the evidence showing that some of these conspirators received the sums of money which fell to their share upon a division of the sum agreed to be paid.

It is urged that there was no proof of a mutual agreement between these parties. But it is difficult to understand how such large sums of money could be paid as was established by the evidence in this case unless somebody had agreed to pay them. It is entirely immaterial, for the purpose of establishing the charge as against this defendant that the identity of the person promising should be proved. It is sufficient if the agreement to accept a bribe is proved with some person, no matter whom.

The objection to the exclusion of testimony as to the views of property-holders and taxpayers in respect to the policy of the building of a Broadway road is not well taken. The crime of bribery is just as much proved by showing that the officer bribed does his duty under the influence of a bribe, as though he was shown to have violated his duty under the same influence. In every case in which it could be shown that the opinion of the taxpayer or property-owner was communicated to the defendant, such evidence was admitted, but only in those cases where no such communication was proved were the opinions of the witnesses in this regard excluded.

It becomes now necessary to consider an exception to which the attention of the court was directed, and which seems to have been inserted in the points expressly to mislead the court. In the tenth point the learned counsel say that the court erred in excluding the testimony of the defendant as to his object and purpose in voting for the granting of the franchise to the Broadway Surface Railroad Company. In support of this proposition the attention of the court is called to the pretended fact that the defendant during the course of his examination, had in reply to certain inquiries

.said that he had voted twice in the Board of Aldermen in
favor of granting such franchise, and that thereupon he was
asked the following question · "Will you state the object
and purpose of your voting upon each of these occasions?"
and this .question was objected to, the objection sustained,
and an exception taken.

The counsel then say : "Surely nothing could be more perti-
nent to the inquiry under the indictment than this evidence.
The corrupt motive of the defendant in giving this vote upon
this franchise was the most material allegation of the indict-
ment.   The jury were charged to investigate it as they were
compelled to any other fact in the case. Who as matter of fact
.could describe and inform them as to such motive better than
the defendant ?   He certainly had the right to explain and
characterize his motive.   The jury might or might not be-
lieve him.   The evidence certainly was competent.   Its
weight was for the jury to determine, and the court erred in
.excluding it."

It is thus apparent that the intention of the counsel was to
convey to the mind of the court the impression that the de-
fendant had been prevented from explaining and character-
izing his motive in voting for the granting of this franchise
to the Broadway Surface Railroad Company.   When this ex-
.ception was presented by the counsel in his argument and
upon his points, it struck the court as being one of great
magnitude, and possibly of grave error.

Upon an examination of the record, however, it will be
seen that this question had not the slightest relation to any
.such subject; and that in a subsequent part of his examination
the witness was asked the question:   "Will you be kind
.enough to state to the jury what your reason was in casting
your vote in favor of the franchise referred to ?"   which
question was answered at length by the witness, he giving a
full explanation of the motives which induced him to cast
his vote for the franchise.

The exclusion of the evidence to show the financial condi-
tion of the defendant, the source of his income, and his in-

come, and where his customers resided along the line of the road, and his financial condition during the years 1884 and 1885, in detail, was not error.

The condition of the defendant's business, the character of his customers, the source of his income, could reflect no light upon the question which was being investigated by the jury.

If there had been any claim upon the part of the people that this defendant had exhibited any sudden increase of wealth then this evidence might have been competent for the purpose of accounting for whatever money he might be possessed of.

Various exceptions were taken to the charge of the court in reference to the weight to be given by the jury to the evidence of Fullgraff and Duffy. These exceptions it is not necessary to consider in detail. Even though the learned court during the course of his charge may have used expressions in reference to this evidence which were not entirely justified by the law, upon the attention of the court being called to this language by the taking of exceptions, the court distinctly instructed the jury that he left it entirely to them what to do with the testimony in question. And thereafter the contention of the counsel for the defendant upon the subject of this evidence was entirely devoted to the establishment of their right to have the court charge that the jury in consequence of the different statements which Fullgraff and Duffy had made in respect to this matter under oath must disregard their testimony. This the court refused to do, and rightly so. Whatever may have been the rule in relation to the credit to be given by a jury to the testimony of a witness whom they find to have sworn falsely in reference to the subject matter under examination prior to the provisions of the Penal Code, it is no longer the right of a party to have the jury charged that the evidence of such witness must be rejected. That rule was entirely applicable to the condition of the rules of evidence at a time when a conviction for perjury rendered ineligible as a witness the person so convicted. But § 714 of the Penal Code seems to

have reversed the law as previously existing, since it provides that a man convicted of *any crime* is a competent witness in any cause or proceeding civil or criminal, but the conviction may be proved for the purpose of affecting the weight of his testimony. This provision makes it competent for a witness although having been previously convicted of perjury to go upon the stand and testify. Such evidence goes to the jury, and cannot be taken from their consideration by the court, although the conviction may be proved for the purpose of affecting the weight of such testimony. In the case at bar therefore, although Fullgraff and Duffy had in another proceeding given testimony different from that which they gave upon the trial of the defendant, they were not incompetent witnesses. Their evidence could be considered by the jury, their credibility however being affected by the fact of their having previously testified differently.

It is true that in the case of the *People* v. *Petmecky* (99 N. Y. 421 3 N. Y. Crim. 288;) the language of the court might seem to justify the adherence to the rule existing previous to the change in respect to the disqualifying effect of a conviction for perjury. But as the question was not considered by the court it cannot be held to have been adjudicated upon. The learned court therefore, having left the whole question entirely to the jury as to what weight they would give to this testimony of Fullgraff and Duffy, did all that it was required to do by reason of any exception which was taken upon the part of the defendants' counsel.

The exception to the charge of the court in respect to the evidence of Katie Metz seems to be based upon the ground that the instructions of the court to the jury were that they might consider whether her evidence did or did not tend to corroborate the testimony of Fullgraff and Duffy, not only that meetings were held at McLaughlin's house, but that they were of the corrupt character testified by to them.

This is evidently a forced construction of the language used. It was not the intention of the Court to instruct the jury that anything that Katie Metz could testify to, corroborated Full-

graff and Duffy as to what transpired at the meetings themselves but simply that it corroborated them as to the fact of the holding of the meetings, which they, Fullgraff and Duffy, had testified to as being of the corrupt character specified. This was the clear meaning of the proposition of the court: and it was undoubtedly so understood by the jury, as there was no pretence that the witness Katie Metz knew anything as to what transpired at these meetings, the whole purport of her testimony being to show that meetings were held, not to prove what occurred at these meetings.

The claim of the defendants counsel that the court erred in refusing to charge what particular weight was to be given to particular parts of the testimony is not well taken, because the court was required only to give the jury instructions upon legal propositions, and not as to the weight which they should give to isolated portions of the testimony.

The only remaining exception to be considered is that in regard to the question of corroboration, and in view of the decision of the Court of Appeals in the case of the *People* v. *Jaehne* (103 N. Y. 4 N. Y. Crim. 478;) this question does not seem to be open for discussion.

It is true that the nature of the corroboration where a conviction is sought upon the testimony of accomplices varies somewhat from a case in which conviction is sought upon the confession of the defendant. But it would seem that the corroboration in the former case might be of a less substantial character than in the latter. A conviction cannot be had upon the confession of a defendant without additional proof that the crime charged had been committed.

The evidence in the Jaehne case was held by the Court of Appeals to contain additional proof that the crime charged had been committed, and therefore the conviction upon the confession of the defendant was upheld. A conviction cannot be had upon the testimony of an accomplice unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the crime. The distinction between the two matters of corroboration is ap-

parent. In the case of a confession there must be additional proof that the crime has been committed. In the case of a conviction upon the testimony of an accomplice, there must be other evidence tending to connect the defendant with the commission of the crime. The *corpus delicti* cannot be entirely established by a confession: but it may be established by the testimony of an accomplice; and therefore, if there was corroborative evidence in the case of Jaehne tending to show that the crime with which he was charged had been committed, there was certainly evidence in the case at bar other than that of Fullgraff and Duffy tending to connect the defendant with the commission of the crime because the evidence in the case of Jaehne other than his confession which proved that the crime charged had been committed necessarily included all the persons engaged in the commission of that crime with it.

It would therefore seem to be entirely unnecessary in view of the decision of the Court of Appeals in that case to discuss the proposition as to whether there was the additional proof connecting the defendant with the commission of the crime which the statute requires.

The judgment appealed from should be affirmed.

NOTE. Where a charge is based on the willful and corrupt false swearing of witnesses there is no error in instructing the jury that they may disregard their evidence. *Jordan* v. *State*, Ala., Feb. 1887, 1 So. Rep. 577

A judgment will not be reversed for the admission of inadmissible evidence which is immaterial. *Lerche* v. *Brasher*, 101 N. Y. 157.