382 So.2d 1009 (1980)
Margaretta LeSage MEARES et al., Plaintiffs-Appellees,
v.
PIONEER PRODUCTION CORPORATION et al., Defendants-Appellants.
No. 7439.
Court of Appeal of Louisiana, Third Circuit.
March 5, 1980.
Rehearings Denied May 5, 1980.
*1011 Liskow & Lewis, Lawrence P. Simon, Jr., Lafayette, for defendant-appellant, Pioneer Production.
Robert H. Carpenter, Jr., Baton Rouge, for defendant-appellant, Union Oil Co.
Gordon, Arata, McCollam & Walters, John M. McCollam, New Orleans, Sanders, Downing, Kean & Cazedessus by Gordon Kean, Jr., Baton Rouge, for plaintiffs-appellees.
Before CULPEPPER, GUIDRY and DOUCET, JJ.
GUIDRY, Judge.
This declaratory judgment action concerns ownership of the fee title to a strip of land 200' in width which cuts diagonally across Lots 5, 6, 11 and 12 or Fractional SW/4 Section 1, Township 10 South, Range 3 West, Jefferson Davis Parish, Louisiana. The strip of land in question contains approximately twelve (12) acres and is burdened with a servitude for railroad purposes in favor of the Louisiana Western Railroad Company (now Southern Pacific Railroad).
The adverse claimants to the fee title of the twelve acre tract, hereafter referred to as the "disputed strip" are plaintiffs, Margaretta LeSage Meares and Mayble Oliver Williams, hereafter referred to as the "Kernan heirs", and defendant, Union Oil & Development Company, Ltd., hereafter "Union", a formerly defunct Louisiana corporation now in involuntary liquidation under the provisions of LSA-R.S. 12:143G. The other plaintiffs W. G. Gillette, Jr., Richard D. House, Willis E. Conaster, Andrew McCollam, Jr., and Abaco Exploration, Inc., hereafter "Gillette Group" are the oil, gas and mineral lessees of the Kernan heirs. The remaining defendant, Pioneer Production Corporation, hereafter "Pioneer" is the oil, gas and mineral lessee of defendant, Union.
The chain of title to the disputed strip and other matters directly related thereto is set forth in a joint stipulation of the parties. The joint stipulation reflects the following:
1. Prior to segregation from sovereignty of Frl SW/4 Section 1 T. 10 S., R. 3 W. the United States, pursuant to Act of Congress of March 3, 1875 (18 Stat. 482, 43 U.S.C.A. 934) granted to the Louisiana Western Railroad Company a servitude one hundred (100) feet wide on each side of the center line of the company's railroad, which servitude, as ultimately located, extended through the Fractional SW/4 Section 1 T. 10 S., R. 3 W.
2. By U.S. Patent dated November 6, 1889, Samuel Cooper acquired Lots numbered 5, 6, 11 and 12 or the entirety of Fractional Southwest Quarter of Section 1 T. 10 S., R. 3 W., said to contain 179.96 acres, the original of which patent was recorded in Book 38, folio 556, Conveyance Records of Calcasieu Parish, Louisiana.[1]
3. By deed dated October 16, 1901, recorded in Book 39, folio 290, conveyance records of Calcasieu Parish, Samuel Cooper conveyed the entire tract of land patented by him as aforesaid to Union.
*1012 4. By deed dated August 23, 1903, recorded in Book 46, folio 356, records of Calcasieu Parish, Union sold that portion of the property acquired by it from Cooper located northwest of the north boundary of the Railroad right-of-way to Frederick C. Hubbell. We will refer to this tract hereafter as the "Hubbell Tract".
5. By tax sale held November 28, 1904 dated and recorded December 31, 1904, in Book 64, folio 11, Conveyance Records of Calcasieu Parish, Thomas J. Kernan purported to acquire, as tax purchaser, from Union, as tax debtor, property in said sale described as Lots 5, 6, 11 and 12 or Frac. SW Sec. 1-10-3.
6. The copy of the ad valorem tax assessment rolls for the Parish of Calcasieu for the Year 1903 on file in the State Auditor's office[2] reflect an assessment to Frederick C. Hubbell of the property acquired by him as set forth in numbered paragraph 4 above.
On this same assessment roll there appears an assessment in the name of Union of the following described property:
"Lots 5, 6, 11, 12 or Frac. SW Sec. 1-10-3 (Less part sold)".[3]
Under this assessment there is reflected as due $6.00 for State taxes and $10.00 as Parish taxes.
On this same assessment roll there appears an assessment to the Louisiana Western Railroad Company as follows: "60 00/100 miles mainline tract (sic) incl depos and bed @ $12,500 per m10 68/100 miles sidetracked @ $3,000.00 per m. SW SW 35-9-8-SE 25-10-13-SW XX-X-X-XX 71/acres of land at Jacksonville; 1 lot at Vinton 900 X 15. . ."
On this same assessment roll there appears an assessment to Jacob Mentz of the North Half of the Southwest Quarter, Section 1, Township 10 South, Range 3 West. In connection with this latter assessment the record reflects that in the year 1903 Jacob Mentz did not own any land in Southwest Quarter Section 1 T. 10 S. R. 3 W., but did at on time hold recorded title to the N/2 of SW/4 Section 1, T. 10 S. R. 13 W.
7. The publications in the official journal for Calcasieu Parish i. e., the Lake Charles American Press of the list of delinquent tax debtors for the Parish of Calcasieu for the year 1903 on November 11, 17 and 25, 1904 show that among the property to be sold for unpaid taxes of 1903 was the following:
"Union Oil & Dev. Co., lots 5, 6, 11 and 12, or frac SW 1-4, 1-10-3 (less part sold)"
8. The public records of Calcasieu and Jefferson Davis Parishes show no tax sales or adjudications for property assessed to Frederick C. Hubbell or Louisiana Western Railroad Company for 1903 taxes.
9. Thomas J. Kernan, was, according to the charter of Union dated October 12, 1901, one of the original shareholders and a member of the first Board of Directors of the said corporation.
10. By instrument dated April 13, 1908 recorded in Book 93, folio 275, records of Calcasieu Parish Thomas J. Kernan executed a cancellation of the 1904 tax sale in favor of Frederick C. Hubbell insofar as it purported to affect the Hubbell Tract.
11. By instrument dated July 18, 1918 recorded in Book N, folio 295, records of Jefferson Davis Parish, Hon. Paul Capdeville, State Auditor of Public Accounts, purporting to act pursuant to the provisions of Section 7 of Act 315 of 1910, authorized the Recorder of Conveyances of Jefferson Davis Parish to cancel the 1904 tax sale to Thomas J. Kernan in its entirety, stating that "evidence is now on file in this office showing that the sale to Thomas J. Kernan of the property hereinafter described, situated in the Parish of Jefferson Davis, Louisiana, *1013 for the unpaid taxes of 1903, assessed in the name of Union Oil & Development Company, Ltd., is erroneous, to-wit: Lots 5, 6, 11 and 12 or Fractional Southwest Quarter 1-10-3."
In connection with the above the parties stipulated that the record or evidence, if any, on which the Auditor acted in granting the aforesaid cancellation certificate could not be located.
12. By instrument dated June 24, 1942, L. B. Baynard, Auditor of the State of Louisiana, authorized the Recorder of Conveyances of Jefferson Davis Parish to correct his records to exclude from the 1918 cancellation of the December 1904 tax sale that portion of the land covered thereby lying southwest of the south line of the Railroad right-of-way.
13. By instrument dated October 26, 1976 S. E. Vines, Jr., Appropriations Control Director of the State of Louisiana, purported to amend the 1942 Correction instrument, referred to in numbered paragraph 11, so as to exclude the disputed strip from the 1918 Cancellation Certificate described in numbered paragraph 10 above.
14. Any title to the Disputed Strip acquired by Thomas J. Kernan under the December 31, 1904 tax sale if not lost by other acts, is now owned by the plaintiffs, Margaretta LeSage Meares and Maybel Oliver Williams, subject to oil, gas and mineral leases executed by them in favor of the "Gillette Group".
15. Under the provisions of certain Louisiana Department of Conservation Orders, effective in May, July and December, 1974, portions of the disputed strip were included in producing units operated by Pioneer Production Company.
16. By instrument dated September 30, 1976, dated effective September 1, 1974, Warren L. Mengis, Liquidator of Union, granted an oil, gas and mineral lease covering the disputed strip to Pioneer, as lessee.
17. The fee title claimants have never exercised any possession over the disputed strip. The Louisiana Western Railroad Company and its successors have used some for railroad purposes continuously since prior to the year 1900.
The Kernan heirs and their lessees rely for their title on the 1904 tax sale to Thomas J. Kernan, asserting that it is valid and now immune from attack under the peremptive provisions set forth in Article 233 of the Louisiana Constitution of 1898, Article 233 of the Louisiana Constitution of 1913, and Article 10 Section 11 of the Louisiana Constitution of 1921. In addition the plaintiffs-appellees assert that the 1918 cancellation certificate is invalid and of no effect. The Gillette Group asserts in the alternative that should title to the disputed strip be ultimately held to belong to Union and subject to the Pioneer lease that they should be declared owner of the Pioneer lease because such lease was acquired by Pioneer in direct violation of the fiduciary obligation owed by it as operator of the several units in which the disputed strip is located.[4]
On the other hand Union argues that the tax sale upon which their opponents rely was void ab initio and not subject to protection under the constitutional provisions referred to because of dual assessment and prior payment of taxes. Further Union contends that the 1904 tax sale is invalid and ineffective because the tax purchaser, Thomas J. Kernan, was allegedly a shareholder and director of Union in the years 1903 and 1904, and that in such capacities, he owed said corporation a fiduciary duty to pay the taxes. Finally Union contends that the tax sale was effectively cancelled in the year 1918 by the State Auditor pursuant to the provisions of Act 315 of 1910 and that such cancellation is now final, unassailable and not subject to correction as was purported to have been done in the years 1942 and 1976. In addition to the above Pioneer contends in the alternative that even if the title of Union should fail, its lease is still effective since Pioneer took the lease as a third party relying on the faith of the public records.
*1014 The trial court decided the title issue favorable to plaintiffs concluding that the 1904 tax sale to T. J. Kernan was valid and now constitutionally immune from attack. Accordingly, judgment was rendered recognizing the Kernan heirs as owners of the disputed strip, upholding validity of the leases owned by the Gillette Group, and ordering Pioneer, as operator of the several conservation units which include portions of the disputed strip to account to plaintiffs for all production attributable to said tract subject to the obligation of plaintiffs to bear their proportionate share of the cost of unit development and operation.
Defendants have appealed specifying the following errors:
1. The trial court erred in upholding the validity of the 1904 tax sale.
2. The trial court erred in concluding that the 1918 cancellation was invalid and of no effect.
3. The trial court erred in failing to conclude that the mineral lease of Pioneer is valid, primary and in full force and effect by virtue of Pioneer's reliance on the faith of the public records.
We will discuss these issues in the order set forth above.

VALIDITY OF THE 1904 TAX SALE
Appellants assail the validity of the 1904 tax sale on the grounds that (1) there was a dual assessment of a portion of the property sold; (2) there was a prior payment of taxes on a portion of the property sold; (3) the purchase by Kernan is invalid or must be considered for the benefit of Union because Kernan was, in 1904, an alleged shareholder and officer of Union; and, (4) the tax sale was cancelled by the State Auditor in 1918 under the provisions of Section 7 of Act 315 of 1910 (LSA-R.S. 47:1991). The first and second grounds urged for invalidity are closely related issues and will be considered together.
The Louisiana Constitutions of 1898 and 1913 provided that "no sale of property for taxes shall be set aside for any cause, except on proof of dual assessment, or of payment of the taxes for which the property was sold prior to the date of sale, unless the proceeding to annul is instituted within six months from service of notice of sale, which notice shall not be served until the time of redemption has expired, and within three years from the date of recordation of the tax deed, if no notice is given. . ." The jurisprudence interpreting the quoted constitutional provision was to the effect that the sale of property for taxes, a part of which taxes were paid prior to the sale, rendered the tax sale null and void. Harris v. Deblieux, 115 La. 147, 38 So. 946 (La. 1905); Page v. Kidd, 121 La. 1, 46 So. 35 (La.1908); Board of Comm'rs v. Concordia Land & Timber Company, 141 La. 247, 74 So. 921 (La.1917); Eivers' Heirs v. Rankin's Heirs, 150 La. 4, 90 So. 419. In the Constitution of 1921 the tax sale peremptive provision was amended so as to eliminate dual assessment and partial prior payment as a cause for annulment of a tax sale and this amendment was made retroactive except as to pending suits or any suit brought within a period of twelve months from the date of the adoption of the Constitution. Close v. Rowan, 171 La. 263, 130 So. 350 (La.1930). In light of the above appellants argue that the 1904 tax sale is invalid and not subject to constitutional peremption because a portion of the property described in and purported to be conveyed by said sale was dually assessed and taxes were paid under said assessments. In support of this argument appellants point to the assessments of property on the 1903 ad valorem tax rolls to Frederick Hubbell, Jacob Mentz and the Louisiana Western Railroad Company and the apparent payment of taxes by these tax debtors under such assessments as is reflected by the fact that there were no sales for taxes of the properties so assessed. Appellants further argue that the 1904 tax sale was duly cancelled by the State Auditor in the year 1918 under proper authority and that such cancellation effectively foreclosed any possibility of the provisions of the 1921 Constitution being applied retroactively so as to validate the tax sale as to that portion of the disputed strip on which taxes were not paid.
*1015 It must be conceded that if the issue as to whether or not there was a dual assessment and prior payment of taxes on a part of the property sold is to be determined by reference solely to the description of property as set forth in the tax sale, then obviously the sale is invalid for the available evidence in the record reflects that for the year 1903 Frederick Hubbell was assessed with and presumably paid taxes on that part of Frl. SW/4 Sec. 1 T. 10 S.R. 3 W., located northwest of the disputed strip. However, we do not believe, for the reasons hereinafter set forth, that the validity or invalidity of the tax sale should be judged and determined solely be reference to the property as described in the tax sale.
Our statutory law has long provided that for purposes of assessment and tax sales the description of property set forth therein will be sustained so long as it reasonably identifies the property intended to be assessed and sold. Act 140 of 1890, which was the statute in effect in 1904, so provided and such concept has been maintained in effect to this date in LSA-R.S. 47:2181 and 2184. The cases applying this legal concept are legion and have been consistent in sustaining the validity of tax sales containing errors in description or assessment where a consideration of all available evidence permits reasonable identification of the lands intended to be assessed and sold. E. g. Knapp v. Jefferson-Plaquemines Drainage District, 224 La. 105, 68 So.2d 774 (La.1953); Van Norden v. Martin, 149 So.2d 684 (La.App. 1st Cir. 1963) writ refused.
Knapp, supra, states the rule as follows:

"In the jurisprudence of this state it is well settled and established that, where a tax sale is made under an assessment in the name of the owner and an error is made in the description of the land intended to be assessed, the tax sale under such assessment is valid if, notwithstanding the error in description, the land can be reasonably identified by the assessment or description as found in the tax deed, or if the description therein furnishes the means for such identification. Further, if a description of the property intended to be assessed or sold is too indefinite and uncertain as to be defective, resort may be had to evidence outside the assessment roll or tax deed to identify the property, provided such evidence establishes unmistakably the identity of the property. The cases generally hinge on the point as to whether the description is such as to enable interested persons to identify the property. Tillery v. Fuller. 190 La. 586, 182 So. 683, and the numerous authorities therein cited; Jackson v. Irion. 196 La. 728, 200 So. 18, 133 A.L.R. 566; Yuges Realty. Ltd. v. Jefferson Parish Developers. Inc., 205 La. 1033, 18 So.2d 607." 68 So.2d 778.

To the same effect is Brown v. Tauzin, 163 So. 764, 766-67 (La.App. 2d Cir. 1935), rev'd on other grounds, 185 La. 86, 168 So. 502 (1935), where the following analysis appears:
"Section 3 of Act No. 140 of 1890 provides: `That no assessment or tax sale shall be set aside or annulled for any error in description or measurement of the property assessed, in the name of the owner, provided the property assessed or sold can be reasonably identified'.
"And section 4 provides: `That the tax sale shall convey and the purchaser shall take the entirety of the property, neither more nor less, intended to be assessed and sold and such as it was owned by the delinquent tax payer, regardless of any error in the dimensions or description of the property assessed and sold and the tax collector in the advertisement or deed of sale may give the full description according to original titles.'

"It is clear from these provisions of the act, that the tax purchaser has the right to take possession of the land owned by the debtor, and intended to be assessed and sold, and that the tax collector may incorporate in his deed a correct description of the property intended to have been adjudicated for delinquent taxes, regardless of how described on the tax roll or in advertisement of sale, and to this end may refer to original titles. Therefore, *1016 had the tax collector correctly described plaintiffs' land in the deed to Mrs. Tauzin, he would have been within his legal rights, and the deed would be without the objection presently urged against its validity. If a ministerial officer, such as a tax collector, is vested with such authority in such matters, then it seems obvious that in appropriate proceedings in the dispensation of justice a court would unquestionably have the right, by decree, to bring about such a result."

If a tax sale assailed for want of description will be sustained if the description employed in the assessment and/or tax sale although defective affords reasonable identification of the property intended to be assessed and sold then it must follow as a necessary corollary that when a tax sale is attacked on the ground of dual assessment and prior payment a determination as to whether or not there was in fact a dual assessment and prior payment of taxes should be determined on the basis of all available evidence indicating what property was intended to be assessed and sold. Stated another way, it appears to us, that when a tax sale affords reasonable identification although defective in some particular (in the instant case "over description") that resort may be made to the assessment rolls and other extrinsic evidence to determine if in fact there was a dual assessment and prior payment of taxes on the property intended to be assessed and sold. We feel this conclusion to be warranted by the fact that under our law and jurisprudence tax sales are presumed valid and the party attacking same bears the burden of proving the alleged invalidity. See, La.Const.1974 Art. 7, Section 25(A); Stone v. Kimball's Heirs, 199 La. 240, 5 So.2d 758 (La.1942); Verret v. Norwood, 311 So.2d 86 (La.App. 3rd Cir. 1975).
Considering the tax sale, the assessment rolls for the year 1903 and all other pertinent extrinsic evidence in the record we determine that the 1904 tax sale to Thomas J. Kernan is not invalid by reason of dual assessment or prior payment of taxes on a portion of the property sold. As previously indicated on August 23, 1903 Union sold that portion of Frl SW/4 Sec. 1 located northwest of the disputed strip to Frederick C. Hubbell. Hubbell is assessed with the property acquired by him as aforesaid on the 1903 assessment rolls. The assessment to Union for 1903 describes the entirety of Frl SW/4 "Less part sold". The only reasonable interpretation of these two assessments is that the assessor intended to assess to Union the property acquired by it from Samuel Cooper less that portion sold to Hubbell. The exception in the Union assessment although somewhat vague was sufficient in our opinion to put one on notice who might investigate the title that Union had conveyed a portion of the described tract and that such portion so sold was not included in the Union assessment. See Andry v. Pfaff, 3 So.2d 232 (La.App. Orleans 1941). In the year 1903 Union owned no other property in the Parish of Calcasieu other than that acquired by it from Cooper less the part sold to Hubbell and therefore reference to the 1903 assessment rolls for a supportive assessment would have placed one on notice that the description in the tax sale was an "over description". That it was the intention of the assessor and tax collector to assess and sell only that portion of Frl SW/4 Sec. 1 owned by Union in the year 1903 is corroborated by the fact that the several advertisements of delinquent tax debtors for 1903 printed in the official journal of Calcasieu Parish correctly described the property owned by Union. Finally, corroborative of the extent of property intended to be conveyed by the 1904 tax sale is the fact that the lands were sold, according to the proces verbal of the tax adjudication for unpaid State and Parish taxes amounting to $16.00. This is the precise amount of the State and Parish taxes indicated to be due on the 1903 assessment to Union of "Lots 5, 6, 11, 12 or Frac. SW Sec. 1-10-3 (less part sold)".
For the above reasons we conclude that the 1904 tax sale was clearly intended to convey and did in fact convey, the property of Union as described in the 1903 assessment to it and that the "over description" *1017 in the tax sale was an inadvertent clerical error. Accordingly, the assessment to Frederick C. Hubbell of the Hubbell tract does not constitute a dual assessment with the Union assessment nor did the payment of taxes under the Hubbell assessment constitute a prior payment of taxes on any portion of the property sold in the 1904 tax sale to Thomas J. Kernan.
We likewise find that the Mentz assessment and the assessment to Louisiana Western Railroad Company on the 1903 assessment rolls are not dual with the Union assessment. The assessment to the Louisiana Western Railroad Company does not by description purport to cover any part of Frl SW/4 Sec. 1 T. 10 S. R. 3 W., and of course this is consistent with the fact that the railroad owned only a servitude and not the fee title to any portion of said land. As to the assessment to Jacob Mentz the record reflects that Mentz never acquired any part of SW/4 Sec. 1, T. 10 S. R. 3 W., although he did at one time own N/2 of SW/4 Section 1 T. 10 S. R. 13 W. This being so it is reasonable to conclude that the assessment to Mentz with land in Sec. 1 T. 10-3 in lieu of Sec. 1 T. 10-13 is an obvious clerical error which cannot be considered as giving rise to a dual assessment. White v. Lockhard, 129 So.2d 917 (La.App.1961); Verdine v. Carter, 170 La. 226, 127 So. 609 (La.1930); Mansfield Hardwood Lumber Company v. Butler, 234 La. 322, 99 So.2d 129 (La.1958).
Appellants next contend that the tax sale is invalid or must be considered for the benefit of Union because Kernan was, in 1904, an alleged shareholder and officer of Union. Suffice it to say in regard to this contention that there is no admissible evidence in the record establishing any relationship between Thomas J. Kernan and Union in the years 1903 and 1904. It is true that the original charter of Union dated in 1901 reflects that Kernan was a shareholder and director however, it would be only speculation to assume that this relationship continued without interruption or termination up to and including the date on which he purchased the disputed strip at tax sale in 1904. Considering the strong presumption of validity accorded to tax sales if such relationship did exist it was incumbent on defendants-appellants to establish same by competent proof. Having determined that this contention is without merit for lack of evidence we do not reach the substantive issue as to the effect which such a relationship would have upon the validity of the tax sale if evidence in support thereof were in the record.
Finally, appellants urge that the tax sale was effectively cancelled in the year 1918 by the State Auditor pursuant to the provisions of Section 7 of Act 315 of 1910 (now R.S. 47:1991) and plaintiffs-appellants are bound by this cancellation. We disagree.
The cited act reads in pertinent part as follows:

"Upon [a] statement of the facts, made under oath and verified and approved by assessor and collector of the parish or district in which the property is situated, that the assessment is a clerical error, or an erroneous or double assessment, or that the property is exempt by Article 230 of the Constitution from taxation: the auditor may authorize the collector to cancel the assessment on the roll on file in his office, and the recorder of mortgages to erase and cancel the inscription of the tax mortgage. In case the property has been sold for taxes and adjudicated to a third party the auditor shall authorize the recorder of conveyances to cancel the sale." (Emphasis supplied)

According to the cited act the Auditor was authorized to issue a cancellation certificate upon a showing that the assessment on which the tax sale was based was a clerical error; or that the assessment was an erroneous or double assessment; or that the property sold was exempt from taxation. There is nothing in the record to indicate that the property was exempt from taxation and we have previously demonstrated that the assessment was not in error or dual with any other assessment set forth in the 1903 assessment rolls for Calcasieu Parish. Under such circumstances the cancellation was unauthorized, improvidently granted, and without effect. Further, we observe that the certificate of cancellation was issued by the Auditor some 14 years after recordation of the tax sale, long after *1018 passage of the peremptive period provided for in Articles 233 of the Constitution of 1898 and 1913. Act 315 of 1910 authorized the ex parte administrative cancellation of a tax sale merely upon a statement of facts made under oath and verified by the assessor and collector that the assessment is a clerical error, or an erroneous or double assessment or that the property was exempt from taxation. However, the constitution, then in effect, after passage of the three year period specifically provided that no sale of property for taxes shall be set aside for any cause, except on proof of dual assessment or of payment of the taxes for which the property was sold prior to the date of the sale. In our view under the cited constitutional provisions, which have been perpetuated in the constitutions of 1921 and 1974, subsequent to the expiration of the peremptive period the only causes for which a tax sale can be invalidated are those specifically mentioned therein and proof thereof must be adduced in an adversary judicial proceeding. In other words, we conclude that after passage of the constitutional peremptive period there is no remedy available under the provisions of Act 315 of 1910 (R.S. 47:1991). Accordingly, we conclude that the 1918 cancellation certificate was null and void ab initio having been executed by the Auditor in contravention of the provisions of Articles 233 of the Louisiana Constitutions of 1898 and 1913. For the reasons set forth above we determine that the 1904 tax sale is valid and the 1918 cancellation was void ab initio and of no force or effect. In view of this conclusion we need not consider appellants contentions with regard to the inefficacy of the 1942 and 1976 amendments to the 1918 cancellation certificate or plaintiffs-appellees alternative argument that the provisions of Act 315 of 1910 are violative of the due process clauses of the State and Federal Constitutions.

SHOULD THE PIONEER LEASE BE RECOGNIZED AS VALID AND PRIMARY BECAUSE OF THE PUBLIC RECORDS DOCTRINE?
Pioneer contends that if it is held that the 1904 tax sale is valid nonetheless under the public records doctrine its lease from Union should be recognized as valid and primary because Pioneer was entitled to rely upon the apparent validity of the 1918 Cancellation Certificate. We believe Pioneer's reliance on the public records doctrine to be misplaced.
It is well settled in our law that no instrument of writing relating to or affecting immovable property shall be binding on or affect third persons unless and until filed for registry in the office of the parish recorder; and neither secret claims nor other matters outside the public records shall be binding on or affect such third parties (C.C. 2266 and LSA-R.S. 9:2721).
It is now firmly established in our jurisprudence that non-recorded claims are null and void as to third parties in spite of actual knowledge by such third party of the unrecorded claim. In other words actual knowledge of matters dehors the record is not equivalent to registry and therefore one dealing with immovable property is required to look only to one source, i. e., the public records. McDuffie v. Walker, 125 La. 152, 51 So. 100 (La.1909). This is the public records doctrine. A corollary to this rule however, is that a purchaser is charged with knowledge and bound by every thing that the record shows. Thus the public records doctrine does not operate to protect a purchaser or lessee who in examining the public records through error of law attaches significance to one transaction and none to other recorded transactions and as a result acquires from a party who is not the true record owner of the immovable. A purchaser can acquire no better title then was owned by his ancestor in title. Placid Oil Company v. A. M. Dupont Corporation, 244 La. 1075, 156 So.2d 444 (La.1963); Smith v. Taylor, 226 La. 235, 75 So.2d 850 (La.1954); Otis v. Texas Co., 153 La. 384, 96 So. 1 (La.1923).
In the instant case plaintiffs-appellees title to the disputed strip is not vindicated on the basis of secret claims or matters *1019 outside the public records, rather their title is upheld on the basis of the 1904 recorded tax sale which we determine to be valid and which served to divest title out of Pioneer's lessor, Union. It is true that the 1918 cancellation certificate was also of record, however, Pioneer was not entitled to blindly rely on the assumed validity of this cancellation certificate and ignore the tax sale, (which was never cancelled pursuant to this certificate) the ad valorem tax rolls for the year 1903 and other matters of record including the 1942 amendment to the cancellation certificate, all of which reflected doubt as to the validity of the cancellation certificate and that an adverse title to the disputed strip was being actively asserted by the heirs of the tax purchaser. Suffice it to say that under the circumstances of this case we find the public records doctrine inapplicable. In view of this conclusion we need not consider plaintiffs-appellees alternative argument that under the rational of Wells v. Joseph, 234 La. 780, 101 So.2d 667 (La.1958) and Neblett v. Placid Oil Company, 257 So.2d 167 (La.App. 3rd Cir. 1972) even if the public records doctrine would be applicable Pioneer is not entitled to its protection.
For the above and foregoing reasons the judgment of the trial court is affirmed at the cost of defendants-appellants.
AFFIRMED.
NOTES
[1] The Parish of Jefferson Davis was carved out of Calcasieu Parish and therefore the early title to the subject land is recorded there.

All parties agree by stipulation that the initial patentee and his successors in title acquired the lands described in the Cooper patent subject to the prior servitude rights of Louisiana Western Railroad Company and its successors and that the latter has continuously used the servitude for railroad purposes since sometime prior to 1900.
[2] The joint stipulation of the parties reflects that the Assessor's copy and Sheriff's copy of the 1903 assessment rolls for Calcasieu Parish were destroyed by fire in the year 1912.
[3] The joint stipulation reflects that this assessment was the only assessment to Union appearing on the 1903 tax rolls and that Union did not own any other property in the Parish of Calcasieu, Louisiana.
[4] Inasmuch as the trial court decided the title issue favorable to plaintiffs-appellees it did not rule on this alternative demand of the Gillette Group.