741 So.2d 884 (1999)
W.L. WAGNER, et ux., Plaintiff-Appellee,
v.
Stephen R. ALFORD, et al., Defendants-Appellants.
No. 98-1726.
Court of Appeal of Louisiana, Third Circuit.
June 30, 1999.
Writ Denied November 5, 1999.
Thomas Overton Wells, Alexandria, for W. L. Wagner, et al.
James Richard Mitchell, Leesville, for Stephen R. Alford, et al.
Before DOUCET, C.J., COOKS, DECUIR, AMY and PICKETT, Judges.
AMY, Judge.
The plaintiff condominium owners filed a petition for declaratory judgment seeking enforcement of a purported personal servitude establishing rights on the adjacent resort property. The defendant real estate company filed a reconventional demand alleging that the plaintiffs breached an oral agreement wherein the plaintiffs were to be given title to an adjoining condominium unit in exchange for assisting the defendant's purchase of additional condominiums. The defendant maintained that the plaintiffs breached this agreement by failing to satisfy the contract in full. The lower court found for the plaintiffs in *885 both respects. We reverse the lower court's determination as it relates to the purported servitude and affirm that portion relating to the reconventional demand.

Factual and Procedural Background
The plaintiffs in this matter, W.L. and Nina Wagner, purchased a condominium located in the Fairway Villas Condominium Association in 1990. This condominium complex is adjacent to Toro Hills Resort, a hotel and golf facility in Sabine Parish, Louisiana. Stephen Alford, one of the defendants in this matter, testified that, as early as the 1980s, he was part of a partnership that owned three units at the complex. Afterwards, Rael, Inc., a company in which Alford is the sole stockholder, purchased property in the condominium facility. At the time the parties first bought property in the complex, the Toro Hills facility was owned by Toro Investment Corporation.
Mrs. Wagner testified that, after the 1990 purchase of their condominium, services such as garbage collection, sewerage, water, cable television, and telephone services were provided through the hotel. Alford also testified that, as a condominium owner, his services too were provided through the resort for a monthly fee ranging from an estimated amount as low as $50.00 to $75.00 per month. This fee also included maintenance, parking, and privileges at the golf course.
Mrs. Wagner testified that, as negotiations began for the sale of Toro Hills by Toro Investment Corporation, she and her husband, along with Alford, sought to protect the above-listed services. Mrs. Wagner testified that she, along with Alford, confected a "Service Agreement" listing the services they wanted to safeguard.[1] Her testimony indicates that she and her husband presented their copy of the service agreement to George Gouffray, an employee of Toro Investment Corporation who acted as manager of Toro Hills, and that his staff retyped the agreement. The agreement, which was an exhibit at trial, is written on Toro Hills letterhead and provides, the following:
To: Mr. & Mrs. Wagner
From: George GouffrayToro Investment Corp.
Subject: Service Agreement
Date: February 22, 1996
Per our conversation today, please see below the details of the service agreement Toro Hills Resort/Toro Investment Corporation will honor with Mr. & Mrs. Wagner, Condo 4A and 4B.
Services 
1) Present level of services not to be diminished
a. Garbage pickup
b. Sewerage & Water
c. Cable TV & Telephone
d. Upkeep & Maintenance of property
e. Four parking spaces maintained
f. Lifetime golf membership & privileges for family members.
g. Use of personally owned golf cars on golf course
h. Use of all facilities on 265 acres more or less included but not limited to tennis courts, pools, recreation rooms at no additional charges
i. One-half price for motel rooms
j. One-half price for guests golf green fees
k. One-half price for guests golf cart fees
Monthly fee for services will be $75.00 not to increase unless agreed by owner 4A and 4B. Services to be binding on all future owners of property.
The agreement contains the signatures of Mr. and Mrs. Wagner and Gouffray, who signed in his capacity as President of Toro Investment Corp. Gouffray testified that *886 he did not recall the portion of the agreement regarding future owners of the property. Instead, Gouffray stated as follows: "As long as we owned the property, that they could have that agreement." The record indicates that the service agreement was filed with the Clerk of Court for Sabine Parish on July 10, 1996.
In February 1997, Toro Hills, both the hotel and golf facilities, was sold to Alford's company, Rael, Inc. Gouffray's deposition testimony indicates that, during negotiations, he attempted to incorporate the service agreement into the sale of the property, but that Alford refused to buy the property if the agreement was part of the sale. Gouffray stated that he informed the Wagners of Alford's refusal to consider the agreement and that the sale was ultimately completed without the inclusion of the agreement.
Alford testified that following Rael's purchase of Toro Hills, the services outlined in the service agreement were provided for approximately one year. At some point, however, he ceased accepting the $75.00 monthly payments from the plaintiffs. Alford stated that he did not feel that the agreement was valid or binding against Rael and that he stopped accepting the $75.00 payments as he had put together two service packages from which condominium owners could choose and that the plaintiffs never made a choice between the options. He admitted that the new packages presented to the Wagners would result in a higher monthly fee than the $75.00 fee discussed in the original service agreement. The record reveals that many of the services listed in the agreement ultimately ceased to be provided.
In June 1997, the plaintiffs filed a petition for declaratory judgment requesting the court to declare the service agreement binding and enforceable against Rael. Subsequently, Rael filed a reconventional demand against the Wagners asserting that they were indebted to Rael for $49,000.00, the purchase price of the Wagners second condominium at Toro Hills. Thus, Rael asked the court to recognize Rael as the true owner of the condominium or, in the alternative, order the plaintiffs to reimburse the purchase price to Rael.
Following a trial, the lower court ruled in favor of the plaintiffs in both actions. With regard to the declaratory judgment, the court found that the recorded service agreement constituted a valid personal servitude, specifically, a right of use. As for the reconventional demand, the trial court concluded that the plaintiffs had completed the work necessary for receipt of the condominium and that the portion of the oral agreement that had not been completed had been agreed to by the plaintiffs under duress.
The defendants appeal both portions of the lower court's judgment assigning the following as error:
1. The Trial Court erred by upholding the service agreement as a valid personal servitude.
2. The Trial Court erred by denying the reconventional demand of defendants and failed to recognize defendant as the correct owner of condominium Unit 4A.

Discussion

Service Agreement
The defendants assert a variety of deficiencies that arguably prevent the service agreement from being considered a personal servitude. First, they maintain that the agreement was not created by either authentic act or act under private signature and, thus, cannot now be considered a properly confected right of use. They also contend that the plaintiffs have failed to prove that the person entering into the alleged servitude, George Gouffray, had authority to enter into this type of agreement. Further, the defendants maintain that the agreement is invalid as a servitude as it is vague as to the nature and extent of the servitude and, additionally, it requires that the servient estate, in this case Toro Hills, perform services for the *887 plaintiffs which is contrary to the nature of a predial servitude. The plaintiffs continue to argue that the service agreement created a personal servitude of right of use in their favor.
The Louisiana Civil Code provides for two types of servitudes, personal and predial. La.Civ.Code art. 533. A personal servitude, the type at issue, "is a charge on a thing for the benefit of a person. There are three sorts of personal servitudes: usufruct, habitation, and rights of use." La.Civ.Code art. 534. It is the right of use with which we are now concerned.
Article 639 of the Louisiana Civil Code explains that: "The personal servitude of right of use confers in favor of a person a specified use of an estate less than full enjoyment." Only those advantages that may be provided by a predial servitude are permissible rights of use. La.Civ.Code art. 640. Further, "[a] right of use is regulated by application of the rules governing usufruct and predial servitudes to the extent that their application is compatible with the rules governing a right of use servitude." La.Civ.Code art. 645. It is when we turn to the rules pertaining to predial servitudes that we encounter problems with the lower court's determination that the "service agreement" acts as a servitude. Although recorded and arguably created by an act under private signature, we do not conclude that the service agreement is consistent with the articles pertaining to predial servitudes.[2]
La.Civ.Code art. 651 relates to the types of obligations that may be imposed by predial servitude upon the owner of a servient estate, in this case, the Toro Hills property. It provides as follows:
The owner of the servient estate is not required to do anything. His obligation is to abstain from doing something on his estate or to permit something to be done on it. He may be required by convention or by law to keep his estate in suitable condition for the exercise of the servitude due to the dominant estate.
When applying Article 651 to the services listed in the agreement at issue, the lower court concluded that the services were permissible under the statute. The judge explained as follows in his reasons for ruling: "Further, any acts of maintenance required towards the upkeep of the golf, tennis, pool, and recreation room facilities are acts ordinarily occasioned by the golf course and hotel." We conclude that this reasoning was erroneous.
The portions of the service agreement that we find necessarily run afoul of Article 651 are those related to garbage collection, the provision of utilities, property maintenance, and reduced prices for resort services. These services do not relate to the plaintiffs' right of use of the servient estate. Rather, they relate solely to resort services to be provided for the plaintiffs. Furthermore, we note that, arguably, some of these services such as garbage collection and maintenance of the property do not involve the servient estate at all, but, rather, would involve employees of the defendant traveling onto the plaintiffs' property to perform the services. These types of services are more akin to personal obligations than rights of use.
*888 Thus, we consider the remaining provisions of the service agreement. Those portions relating to lifetime golf membership at the golf facilities, use of personally owned golf carts on the course, and general use of Toro Hills facilities are closer to the traditional type of rights of use, i.e., they allow the plaintiffs to do certain things on the servient estate. While these things may be properly transferred as rights of use, they were not created by a traditional method in this case. Rather, they are labeled as services, are listed with a variety of "services" we have concluded are not proper rights of use, and are conferred to the plaintiffs only upon the payment of a monthly fee. Without payment of this fee, any right would be properly withheld and, thus, a servitude has not been conferred. Given the peculiar nature of the agreement, we cannot be certain that a servitude was intended.
La.Civ.Code art. 730 provides that "[d]oubt as to the existence, extent, or manner of exercise of a predial servitude shall be resolved in favor of the servient estate." We note that the wording of the agreement leaves doubt in several regards. Although the parties involved in the agreement may have enjoyed a common understanding of the services, those subsequently interpreting the agreement may have differing opinions as to the meaning of the terms. For example, rather than precisely defining the required services, the agreement contains general statements regarding the provision of sewerage, water, cable television, and telephone. This type of statement could be open to varying interpretations absent a complete factual background. Further, as referenced above, even those portions of the agreement relating to more traditional rights of use are contained in a "service agreement" requiring a monthly charge. La.Civ.Code art. 730 requires that these types of uncertainty be resolved in favor of the defendant. Thus, we reverse the lower court's determination that the service agreement created a personal servitude of right of use. Finding the agreement deficient to constitute a servitude, we need not reach the defendants' remaining arguments as they relate to the service agreement.[3]

Reconventional Demand
At issue in the reconventional demand is the ownership of Condominium 4A, the title of which is in the names of Mr. and Mrs. Wagner. It is uncontested that the $49,000.00 purchase price was provided by Rael. Alford contends that the money for the purchase of the condominium was provided as part of an agreement between the Wagners and Rael. Alford testified that, in exchange for the purchase price, the Wagners agreed to work as agents in securing his company's purchase of other condominiums and time share units at Toro Hills. Alford further asserts that the agreement also required the Wagners to withdraw from the condominium association. In the reconventional demand, Rael maintains that the Wagners refused to withdraw from the condominium association and, therefore, they failed to honor the agreement. At trial, Mrs. Wagner contended that they did not withdraw from the condominium association because Alford refused to guarantee their services. She stated that they "never once said that the protection did not have to be there or the services." The purported agreement was not reduced to writing. The lower court was requested to either order the reimbursement of the purchase price or reform the deed to indicate Rael, Inc.'s ownership of condominium 4A.
Following trial, the lower court found in favor of the Mr. and Mrs. Wagner. He explained as follows in written reasons for ruling:
The critical question here is whether there is a valid contract obligating the *889 Wagners to withdraw from the condominium Regime before they were to receive full ownership of unit 4A. The Wagners have responded to this claim by asserting their efforts of obtaining outstanding interests in other units for Rael, Inc. and other management services as an offset to Rael, Inc.'s reconventional demand. There has been no evidence offered as to the value, if any, to Rael, Inc. or Alford for the Wagners' withdrawal from the Regime or lack of withdrawal. And while the Wagners admitted at trial that at one time they said they would withdraw their units from the condominium regime, this Court is convinced that such condition was compelled under duress due to the threats of termination of necessary services. This Court will not sanction such tactics.
Rael contends that the lower court erred in denying the reconventional demand since both parties agreed that both the real estate work and the plaintiffs' withdrawal from the condominium association were part of the arrangement. They argue that even if the Wagners completed the real estate work, the remainder of the contract was never completed, thus requiring a finding that the contract had not been fulfilled. With regard to the court's finding of duress, Rael contends that finding was erroneous as the agreement was entered into prior to Rael's purchase of the complex and Alford's ability to terminate services.
In reviewing this matter, we are mindful that "[a] party who demands performance of an obligation must prove the existence of the obligation." La.Civ.Code art. 1831. This issue of the existence of some type of agreement does not appear to be contested by the parties. The record supports the conclusion that a general agreement existed whereby the Wagners agreed to perform "leg work" for the purchase of several condominiums. Further, both the plaintiffs and Alford testified that part of the agreement was that they would withdraw from the condominium association.
While we find no error in the lower court's appreciation that some type of oral agreement may have existed between the parties, we do not find that the record establishes the full nature of the agreement or that the Wagners breached any such contract by refusing to withdraw from the condominium association absent recognition of the services for which they sought protection. The record does not evidence whether the withdrawal was to be unconditional or within what time-frame the parties agreed the withdrawal would be performed. Thus, our review of the testimony does not reveal that the lower court was required to find either that Rael adequately proved the full nature of the agreement or that any agreement was breached. Reaching this conclusion, we find no error in the result reached by the lower court in denying the reconventional demand.

DECREE
For the foregoing reasons, the decision of the lower court is reversed as it relates to the service agreement and affirmed with regard to the reconventional demand. All costs of this appeal are to be divided equally between the plaintiffs, W.L. and Nina Wagner, and the defendants, Stephen R. Alford and Rael, Inc.
AFFIRMED IN PART; REVERSED IN PART AND RENDERED.
COOKS, J., CONCURS IN PART AND DISSENTS IN PART AND ASSIGNS REASONS.
DOUCET, C.J., DISSENTS AND ASSIGNS WRITTEN REASONS.
COOKS, J., concurring in part and dissenting in part:
I agree with the majority's finding that the trial court did not err in denying Rael's reconventional demands. I respectfully disagree with the majority's reversal of the trial court's finding that the "Service Agreement" was valid. The majority begins *890 by noting the Louisiana Civil Code provides for two types of servitudes: personal and predial. The "Service Agreement" we are concerned with falls under the heading personal servitude, "a charge on a thing for the benefit of a person." As, the majority notes "[t]here are three sorts of personal servitudes: Usufruct, habitation, and right of use." The trial judge found the plaintiffs possessed a "right of use" affecting the property acquired by Rael. La.Civ.Code art. 645 provides "[a] right of use is regulated by application of the rules governing usufruct and predial servitudes to the extent that their application is compatible with the rules governing a right of use servitude." The italicized language is the linchpin of the disagreement between me and the majority. The majority first concludes the "Service Agreement" does not satisfy the conditions of a predial servitude; and, then finds, without more, that it did not establish a valid "right of use" in favor of the plaintiffs. They cite the following language from La.Civ.Code art. 651
"The owner of the servient estate is not required to do anything. His obligation is to abstain from doing something on his estate or to permit something to be done on it. He may be required by convention or by law to keep his estate in suitable condition for the exercise of the servitude due to the dominant estate."
Finding services relating to garbage collection, utilities, property maintenance, and reduced prices are not traditional right of use obligations, they conclude these items are more akin to personal obligations as opposed to rights of use of the servient estate. The article relating to predial servitudes states the owner of the servient estate is not required to do anything, only to abstain from doing something or permitting something to be done on his estate. Because the noted services and price reduction, requires the owner/his employees to do "something," the majority reasons that the noted services do not satisfy the condition found in La.Civ.Code art. 651.
Though they find more akin to a right of use servitude those services relating to lifetime golf membership, use of personally owned golf carts, general use of Toro Hills facilities, the majority nonetheless reverses the trial court's finding. First, noting these services were not created by "a traditional method" to transfer a right of use and are dependent on the payment of a monthly price, the majority ultimately states: "We cannot be certain that a servitude was intended."
I disagree with the majority's position relating to the validity of the "Service Agreement" for two reasons. First, La. Civ.Code art. 645 does not require in every instances that a right of use fits the definition or conditions of a usufruct or predial servitude. The article specifically declares such right of use shall be regulated by the rules applicable to usufructs and predial servitudes to the extent that their application is compatible. The majority opinion makes no reference to the latter and, in fact, ignores the more expansive language found in the article. When a conflict occurs or the rules just do not fit, article 645 does not require that we vitiate the parties' undertakings. The service agreement in this case granted plaintiff a right of use albeit a non-traditional one. Times are "a changing" and the kinds of "understandings and undertakings" between contracting parties are too. The redactor of the code were not shortsightedthey envisioned the day when a right of use might not be compatible with the rules applicable to usufruct and predial servitude. That day has come in this case; and, nothing in the civil code prevented the trial judge from finding the at issue agreement to provide the noted services valid.
Second, I vehemently disagree with the majority's finding that the remaining services, though akin to the those typed as rights of use, do not establish a servitude because for some reason they cannot surmise what the parties intended. I have *891 read the "Service Agreement" carefully and it is very clear to me what the parties intended. There is nothing ambiguous or confusing in the document; and, there is nothing I find "peculiar" about it; its pretty straightforward. In expressing their intent, the parties were not required to use legal jargon. I know what they meant to do, they knew what they meant, and even Alford does not deny that he had the same understanding. He acquired the property knowing the agreement existed, after it was recorded in the public record.
DOUCET, C.J., DISSENTING.
The record herein contains the Declaration Establishing a Condominium Regime Under the Provisions of LSA-R.S. 9:1121.101 et seq., and Establishing the Covenants and Restrictions of the Fairway Villas Condominiums. The provisions thereof are sufficient to establish servitudes for ingress and egress, support, maintenance and repair of the units as well as for utilities including electric power, gas, hot and cold water, and garbage and sewerage disposal. In light of the provisions of that document, I would render declaratory judgment finding the existence of a servitude for those purposes. As a result, I respectfully dissent from the majority herein.
NOTES
[1] Alford did not testify that he actually helped confect the document, but did testify that he felt that the services at issue should be protected. He stated that he never had a similar document signed.
[2] La.Civ.Code art. 708 provides that "[t]he establishment of a predial servitude by title is an alienation of a part of the property to which the laws governing alienation of immovables apply." Further, Article 722 states that "[p]redial servitudes are established by all acts by which immovables may be transferred. Delivery of the act of transfer or use of the right by the owner of the dominant estate constitutes tradition."

With regard to the permissible means of transferring immovable property, La.Civ.Code art. 1839 instructs as follows:
A transfer of immovable property must be made by authentic act or by act under private signature. Nevertheless, an oral transfer is valid between the parties when the property has been actually delivered and the transferor recognizes the transfer when interrogated on oath.
[3] We have not been asked to, nor do we, consider the enforceability of any potential contractual obligation under the agreement.