813 So.2d 512 (2002)
W.L. WAGNER, et ux.
v.
FAIRWAY VILLAS CONDOMINIUM ASSOCIATES, INC., et al.
No. 01-0734.
Court of Appeal of Louisiana, Third Circuit.
March 13, 2002.
Rehearing Denied May 1, 2002.
*513 Michael Steven Beverung, Book & Beverung, Lake Charles, LA, Counsel for Plaintiffs/Appellees, W.L. Wagner, Nina Wagner.
James Richard Mitchell, Leesville, LA, Counsel for Defendant/Appellant, Fairway Villas Condominium Associates, Inc., Rael, Inc., Toro Investment Corporation.
Court composed of ULYSSES GENE THIBODEAUX, JOHN D. SAUNDERS, BILLIE COLOMBARO WOODARD, GLENN B. GREMILLION, and ELIZABETH A. PICKETT, Judges.
GREMILLION, Judge.
The defendant, Rael Inc., appeals the judgment of the trial court granting a permanent injunction in favor of the plaintiffs, W.L. and Nina Wagner, ordering it to restore water service to their condominiums located in the Emerald Hills Resort. After further review, we reverse.

FACTS
Hodges Gardens and its associated resort were established by Andrew Jackson Hodges in Florien, Louisiana. Prior to his death in 1966, Mr. Hodges sold the resort and contracted to continue providing water to it from his well located on the property containing the garden. The resort became known as Toro Hills Resort. At some point, condominiums were constructed on the resort near the golf course. They also received their water from the supply received by the resort's hotel from Hodges Gardens. The Wagners purchased their first condominium in 1989, but did not begin living there permanently until 1991. Initially, they paid sixty dollars per month for services received from Toro Hills, which included water, but this increased to seventy-five dollars per month after 1991.[1] *514 The Wagners purchased their second condominium approximately one year prior to the date of trial, but have never paid any additional amounts for services associated with this condominium. In addition to owning these two condominiums, the Wagners manage other condominiums that are part of the Fairway Villas Condominium Association, Inc.
In February 1997, Rael purchased Toro Hills, including the golf course and all of the land surrounding the condominiums. Thereafter, it became known as the Emerald Hills Resort. Steve Alford is the sole shareholder of Rael. Following its purchase, Rael entered into a contract with the A.J. and Nona Trigg Hodges Foundation for the sale of surplus water from Hodges Gardens to the Emerald Hills Resort. The contract provided for such at the rates prevailing for the sale of water in the Town of Many, and further provided that the water would solely be used "within the motel or hotel and adjacent condominiums constituting Emerald Hills Resort."
Prior to the sale, the Wagners entered into a service agreement with George Gouffray, the president of Toro Investment Corporation, on February 22, 1996. The agreement provided that the listed services would continue at the amount of seventy-five dollars per month, would not be increased unless agreed to by the Wagners, and would be binding on all future owners of the property. Although this agreement was filed with the Sabine Parish Clerk of Court on July 10, 1996, it was not included in the sale of the resort at Alford's insistence.
In June 1997, the Wagners filed suit seeking a declaratory judgment that the February 22, 1996 service agreement was binding against Rael. Rael reconvened against the Wagners on a non-related issue pertaining to the ownership of their second condominium. Following a hearing, the trial court declared that the recorded service agreement constituted a valid personal servitude, via a right of use, in favor of the Wagners. On appeal, a five judge panel of this court reversed the trial court's judgment finding that no personal servitude arose as a result of the service agreement. See Wagner v. Alford, 98-1726 (La.App. 3 Cir. 6/30/99); 741 So.2d 884 (Doucet, C.J., Cooks, J. dissenting), writ denied, 99-2265 (La.11/5/99); 750 So.2d 192.
Following this judgment, but prior to October 1999, the services provided to the Wagners had been reduced to only the provision of water. In October, Rael refused the Wagners' seventy-five dollar check and, without warning, shut off their water the day before Thanksgiving. On November 24, 1999, the Wagners filed a Petition for Damages and Injunctive Relief seeking to have their water restored. Named as defendants were the Fairway Villas Condominium Association, Inc., Rael, and Toro Investment Corporation. On December 14, 1999, the trial court issued a temporary restraining order directing Rael to immediately restore water service to the Wagner's condominiums. The Fairway Villas Condominium Association was later dismissed from the action on an exception of no cause of action. Although there is no record of it, Rael filed an exception of res judicata based on our prior decision; however, this exception was denied by the trial court. Thereafter, Rael answered and reconvened against the Wagners seeking payment of seventy-five dollars per month per condominium from February 1997, through the date of the trial if a valid contract was held to have existed between the parties.
Following a trial on the merits, the trial court rendered judgment in favor of the Wagners ordering the December 14, 1999, *515 preliminary injunction be made permanent. It further awarded damages in the amount necessary for the installation of a water meter on the water line supplying their condominiums, and ordered the damages paid within thirty days. Finally, the trial court denied Rael's reconventional demand. At Rael's request, written reasons for judgment were issued by the trial court on February 20, 2001. This appeal by Rael followed.

ISSUES
On appeal, Rael raises four assignments of error:
1) The trial court erred in finding it liable to the Wagners for a breach of contract.
2) The trial court erred by finding evidence of a predial servitude benefitting the Wagners' property.
3) The trial court erred by finding it liable to the Wagners for an abuse of rights.
4) The trial court erred by dismissing its reconventional demand.

RES JUDICATA
In its first assignment of error, Rael argues that the trial court erred in finding it liable for a breach of contract because the Wagners' claims were barred pursuant to res judicata based on our prior decision.
In the prior matter, the Wagners sought, via a declaratory judgment, to have the February 22, 1996 service agreement declared binding and enforceable against Rael. The trial court held that it was based on a finding that a personal servitude, right of use, arose from the agreement. We reversed the trial court's judgment finding:
Only those advantages that may be provided by a predial servitude are permissible rights of use. La.Civ.Code art. 640. Further, "[a] right of use is regulated by application of the rules governing usufruct and predial servitudes to the extent that their application is compatible with the rules governing a right of use servitude."
Wagner, 741 So.2d at 887.
Applying these precepts, we held that the provision of utilities was not a permissible right of use since it related "solely to the resort services to be provided for the plaintiffs," and did "not relate to the plaintiffs' right of use of the servient estate." This, we held, failed to comport with the intent of La.Civ.Code art. 651, which provides:
The owner of the servient estate is not required to do anything. His obligation is to abstain from doing something on his estate or to permit something to be done on it. He may be required by convention or by law to keep his estate in suitable condition for the exercise of the servitude due to the dominant estate.
However, in a footnote, we stated, "We have not been asked to, nor do we, consider the enforceability of any potential contractual obligation under the agreement." Wagner, 741 So.2d at 888, n. 3.
In Avenue Plaza, L.L.C. v. Falgoust, 96-0173, pp. 4-5 (La.7/2/96); 676 So.2d 1077, 1079, the supreme court stated the law pertaining to res judicata:
Res judicata bars relitigation of a subject matter arising from the same transaction or occurrence of a previous suit. LSA-R.S. 13:4231. It promotes judicial efficiency and final resolution of disputes. Terrebonne Fuel & Lube v. Placid Refining, 95-0654, 95-0671, pp. 11-12 (La.1/16/96); 666 So.2d 624, 631. A judgment determining the merits of a case is a final judgment. La.C.C.P. art. 1841. See also, Tolis v. Board of Sup'rs of Louisiana State University, 95-1529 *516 (La.10/16/95); 660 So.2d 1206. A valid and final judgment is conclusive between the same parties, except on appeal or other direct review. LSA-R.S. 13:4231....
A final judgment from which there can be no appeal acquires the authority of the thing adjudged. La.C.C. art. 3506(31). Once a final judgment acquires the authority of the thing adjudged, no court has jurisdiction to change the judgment, regardless of the magnitude of the final judgment's error. Tolis at 3; 660 So.2d 1206-1207.
The supreme court went on to state:
In 1990, the Legislature amended LSA-R.S. 13:4231, the Louisiana res judicata statute. Terrebonne Fuel addressed the amended statute. The original Louisiana doctrine of res judicata was based on a correctness presumption rather than a cause of action's extinguishment: a decided case precluded a second suit only if the prior suit involved the same parties, the same cause, and the same object of demand. Terrebonne Fuel at 12; 666 So.2d at 632. However, the amended res judicata statute's chief inquiry is whether the second action asserts a cause of action which arises out of the transaction which was the subject matter of the first action. Id.

Id. at 1080.
Several exceptions to the general rule of res judicata are provided in La.R.S. 13:4232:
A. A judgment does not bar another action by the plaintiff:
(1) When exceptional circumstances justify relief from the res judicata effect of the judgment;
(2) When the judgment dismissed the first action without prejudice; or,
(3) When the judgment reserved the right of the plaintiff to bring another action.
In the present matter, the trial court rendered judgment in favor of the Wagners finding that an enforceable obligation existed between them and Rael under three separate theories of law: contract, servitude, and abuse of right. The only question rightly before the trial court concerned the enforceability of any potential contractual obligations pursuant to the February 22, 1996 service agreement. This was the only issue reserved to the Wagners in our prior judgment. All other issues were barred by res judicata since they asserted a cause of action which arose out of the same transaction which was the subject matter of the prior action.
Even if res judicata did not prevent us from addressing these issues, we would still reverse the trial court's finding that Rael was required to provide the Wagners with water due to the existence of a servitude and because of an abuse of rights. The trial court held that the water supplied to the Wagners through pipes running under the resort's property constituted an apparent predial servitude which was established via destination of the previous owner. This finding is clearly wrong.

PREDIAL SERVITUDE
A predial servitude is either apparent or nonapparent. La.Civ.Code art. 707. An apparent servitude is one which is "perceivable by exterior signs, works, or constructions, such as a roadway, a window in a common wall, or an aqueduct." Id. Nonapparent servitudes have "no exterior signs of their existence; such as the prohibition of building on an estate or of building above a particular height." Id. Apparent servitudes are acquired by "title, destination of the owner, or by acquisitive *517 prescription." La.Civ.Code art. 740. Nonapparent servitudes can only be acquired by title, "including a declaration of destination under Article 741." La.Civ. Code art. 739. Destination of the owner is described in La.Civ.Code art. 741:
Destination of the owner is a relationship established between two estates owned by the same owner that would be a predial servitude if the estates belonged to different owners.
When the two estates cease to belong to the same owner, unless there is express provision to the contrary, an apparent servitude comes into existence of right and a nonapparent servitude comes into existence if the owner has previously filed for registry in the conveyance records of the parish in which the immovable is located a formal declaration establishing the destination.
In this instance, the pipes supplying water to the condominiums constitutes a nonapparent, rather than an apparent, servitude. No evidence was admitted establishing that the pipes could be perceived by any exterior works, such as a meter. Lee Musick, the general manager of Hodges Gardens, testified that there were no individual meters on the water lines leading from the resort to the condominiums. Rather, he stated that the resort's water meter was located across Highway 171 on Hodges Garden's property approximately one mile from the resort's water tank. In his treatise on predial servitudes, Professor Yiannopoulos stated:
The classification of a particular servitude as apparent or nonapparent depends on facts and circumstances rather than on the nature of the servitude. Thus, a servitude of right of way may be apparent or nonapparent. If the right of way is exercised over an arid tract of land, without a trace, the servitude is nonapparent; if it is exercised on a paved road or a railway tract, the servitude is apparent. Likewise, if the pipes of an aqueduct are buried into the ground, the servitude is nonapparent; if the pipes are visible, the servitude is apparent.

4 A.N. YIANNOPOULOS, LOUISIANA CIVIL LAW TREATISE, PREDIAL SERVITUDES, § 13 at 41-42 (2nd ed. 1997) (footnotes omitted) (emphasis added). Accordingly, the pipes running under the resort's ground and leading to the condominiums constituted a nonapparent servitude which could only be established by title. Since there is no evidence of a declaration of destination being filed for registry in the conveyance records of the clerk's office prior to the division of the two estates, a servitude did not come into existence by way of destination of owner.
A servitude may also be established by title, including an act under private signature. La.Civ.Code art. 739; see also La. Civ.Code arts. 722 and 1839. Although the service agreement constituted an act under private signature, its existence in the public records does not render it a valid predial servitude. See Camel v. Waller, 526 So.2d 1086 (La.1988); Phillips v. Parker, 483 So.2d 972 (La.1986). Our prior opinion has already held that the provision of utilities, including water, was not a valid predial servitude since it required the servient estate to perform affirmative duties, in contravention of La.Civ.Code art. 651. We agree with our prior opinion that the services provided in the service agreement are more akin to personal obligations which are only binding upon the parties to the argument. Since this was a personal obligation, Rael would only be bound by the service agreement had it assumed the obligation in the purchase of Toro Hills. Since it did not, it is not bound by the agreement.

*518 ABUSE OF RIGHT OF OWNERSHIP
We further find that the trial court was clearly wrong in finding Rael abused its right of ownership by refusing water service to the Wagner's condominiums. In Steier v. Heller, 31,733, pp. 6-7 (La.App. 2 Cir. 5/5/99); 732 So.2d 787, 790-91, the court stated:
The doctrine of abuse of rights has been invoked sparingly in Louisiana. Massachusetts Mut. Life Ins. Co. v. Nails, 549 So.2d 826 (La.1989); Oliver v. Central Bank, 26,932 (La.App. 2nd Cir.5/10/95), 658 So.2d 1316, review denied, 95-1469 (La.9/22/95), 660 So.2d 477; G.I.'s Club of Slidell, Inc. v. American Legion Post No. 374, 504 So.2d 967 (La.App. 1st Cir.1987). The abuse of rights doctrine is a civilian concept which is applied only in limited circumstances because its application renders unenforceable one's otherwise judicially protected rights. Massachusetts Mut. Life Ins. Co. v. Nails, supra; Truschinger v. Pak, 513 So.2d 1151 (La. 1987); Oliver v. Central Bank, supra.... The abuse of rights doctrine applies only when one of the following conditions are met:
(1) the predominant motive for exercise of the right is to cause harm;
(2) there is no serious or legitimate motive for exercise of the right;
(3) the exercise of the right violates moral rules, good faith, or elementary fairness; or
(4) the exercise of the right is for a purpose other than that for which it was granted.
Massachusetts Mut. Life Ins. Co. v. Nails, supra; Truschinger v. Pak, supra; Lilawanti Enterprises, Inc. v. Walden Book Co., Inc., 95-2048 (La.App. 4 Cir.2/29/96), 670 So.2d 558; Owens & Sons, Inc. v. Casey, 94-2580 (La.App. 4 Cir. 7/26/95), 659 So.2d 541; Oliver v. Central Bank, supra; McInnis v. McInnis, 618 So.2d 672 (La.App. 2nd Cir. 1993); G.I.'s Club of Slidell, Inc. v. American Legion Post No. 374, supra.
The trial court determined that Alford's actual reason for shutting off the Wagners' water supply was to render their property uninhabitable and force them to agree to a new contract. It based this on the fact that Alford had entered into a contract with Northwestern State University for the provision of water to its two condominiums. The trial court relied on the deposition testimony of Musick to substantiate Alford's testimony concerning the contract with Northwestern. However, Musick made no mention of this in his deposition. He did state that it would be easy to place a water meter on the lines supplying the condominium and accept money from the condominium owners.
We find error with the trial court's finding. Alford testified that he offered a contract to the Wagners in mid-1997, which would provide them with water, sewerage, garbage, and ground maintenance for forty-five dollars per condominium per month. Although no agreement was reached with the Wagners, he stated that they continued paying seventy-five dollars per month for their first condominium, but paid nothing for their second condominium or the twelve timeshare units they controlled even though a water bill was sent to them pertaining to these units. Alford stated that he terminated the water supply to the condominiums after the completion of the prior suit in November 1999, because he thought that the provision of water was addressed in that judgment and that he was no longer required to provide it. He further stated that he did not believe a contract existed between Rael and the Wagners for the supply of water. Although he admitted to the contract with Northwestern, he stated that he *519 did not want to be in the water business and that he cut off the water because he did not want to do business with the Wagners. When questioned by the trial court, he expounded on that statement by stating that he had been in court with them for approximately three and a half years and that he felt they were stealing from him by using the water for their condominiums and the twelve timeshares without paying anything other than the seventy-five dollars they paid each month for their first condominium.
After reviewing the evidence, we do not find that any of the conditions necessary to find an abuse of right by Rael have been met. Alford's predominant motive for cutting off the water was the failure of the Wagners to pay for the water or to agree to a new contract for the provision of water. This was a legitimate motive. Further, Alford stated that he only cut off their water supply after the judgment rendered by this court became final. Thus, the exercise of the right did not violate moral rules, good faith, or elementary fairness. Nor do we find that the exercise of the right was for a purpose other than that for which it was granted. A public entity or private company providing water to a residence has the right to cut that supply off upon the failure of the party to remit payment. Accordingly, we do not find that Rael has abused the right of ownership of its property by cutting off the Wagners' water supply.

CONTRACTUAL OBLIGATION
The trial court held that a valid contract existed due to tacit acceptance based on Rael's continued acceptance of payment from the Wagners for the reduced services provided. The trial court based its decision on Rael's continued provision of water to the Wagners until November 19, 1999, despite our judgment of June 30, 1999. It stated that "[t]his action indicates his knowledge that an obligation to supply water existed regardless of the validity of the written services agreement." However, this overlooks the fact that our judgment did not become final until after writs were denied by the supreme court on November 5, 1999. Rael purchased the resort in February 1997. In mid-1997, Alford presented a package for services to the Wagners, which they refused. In June 1997, they filed the original suit seeking a declaratory judgment based on the February 22, 1996 service agreement. Our opinion in that matter was rendered on June 19, 1999, and became final upon the denial of writs on November 5, 1999. Thus, we find that there was no consent on Rael's part to the prior service agreement, and that its actions did not constitute acceptance of the agreement during the pendency of the prior suit. Accordingly, we find that no valid contract existed between Rael and the Wagners. The judgment of the trial court is reversed.

RECONVENTIONAL DEMAND
In its final assignment of error, Rael argues that the trial court erred in dismissing its reconventional demand. In the event that the trial court finds that a valid contract existed between it and the Wagners, Rael asked that it be awarded seventy-five dollars per month per condominium from February 1997 through the date of trial. However, since we have reversed the trial court's judgment with regard to the existence of a valid contract, this issue has been rendered moot.

CONCLUSION
For the foregoing reasons, we find that our judgment of June 19, 1999, was a final judgment which became res judicata and conclusive between the parties on all issues, except contractual, upon the denial of *520 writs by the supreme court on November 5, 1999. The judgment of the trial court finding that a valid contract existed between the Wagners and Rael, Inc. is reversed. The costs of this appeal are assessed to the plaintiffs-appellees, W.L. and Nina Wagner.
REVERSED.
WOODARD, J., dissents with written reasons.
WOODARD, J., dissenting.
I respectfully dissent.
I believe that the February 22, 1996, Wagner/Toro service agreement (attached)[1], controls this legal issue and is binding on Rael, Inc. (Rael).
The majority's decision, that it does not bind Rael, appears, ultimately, to be predicated on the majority's classification of the obligations as being "personal." However, the majority does not determine the pivotal issue; i.e., the effect, on third party purchasers, of a properly recorded personal obligation.[2]
I believe the majority's classification to be in error, according to the Louisiana Civil Code. Notwithstanding, classification of an obligation as personal or real does not, necessarily, determine whether the contract is enforceable against third party purchasers. Validity of the contract, in the case sub judice, is not at issueonly its enforceabilityand when the contract, delineating the obligations, is duly recorded, a third party purchaser is bound by it, in toto, regardless of the obligation's classification.[3] Accordingly, under our facts, the Public Records Doctrine is determinative that this contract is enforceable against Rael, a third party purchaser.[4]

* * * * *
The majority cites Camel v. Waller[5] and Phillips v. Parker[6] for the proposition that a service agreement's "existence in the public records does not render it a valid predial servitude;" however, I submit that these cases, rather, stand for the proposition, generally, that when the law of recordation applies, an interest in immovable property is effective against third persons only if it is recorded; if the interest is not recorded, it is not effective against a third person, even, if the third person knows of the claim. That is precisely the situation in the instant case. The Wagner/Toro service agreement was properly recorded in Sabine Parish's Clerk of Court's office on July 10, 1996, before Rael purchased the property. Thus, according to the cases, upon which the majority relies, the contract would be binding on Rael.
Additionally, the majority characterizes Rael's obligation to provide water, through underground pipes, to the Wagners' condominiums as a non-apparent servitude and concludes that it could only be established by title; and "since there is no evidence of a declaration of destination being filed for registry in the conveyance records of the clerk's office prior to the division of the two estates, a servitude did not come into existence by way of destination by owner." (Emphasis added.)
*521 Initially, it is noteworthy that "title" is inclusive of "contract,"[7] which is what we have. Furthermore, it appears that these principles would be relevant if one owner had owned, both, the Toro estate and the Wagner condominiums and, subsequently, divided them, presenting the question of whether the Wagner estate would still be entitled to receive water as it previously had.[8] However, there is no evidence in the record of a previous common ownership. In fact, the first opinion, concerning this case, states that "The plaintiffs in this matter, W.L. and Nina Wagner, purchased a condominium located in the Fairway Villas Condominium Association in 1990. This condominium complex is adjacent to Toro Hills Resort, a hotel and facility in Sabine Parish, Louisiana."[9] (Emphasis added.) Thus, the above principles, upon which the majority relies, are inapplicable to the case at bar.
What is germane in the instant case is that this "servitude" was created by contract a contract whose validity is not challenged and which was properly recorded before Rael's purchase. Creating a servitude by contract is permissible.[10] "Precise technical terms are not necessary to create a predial servitude; nor is the word `servitude' sacramental.... The parties to a contract may even use common law terminology and still validly establish a predial servitude under the civil law."[11] "A document purporting to create a predial servitude is interpreted in accordance with both the general rules of contract construction as well as in accordance with the specific rules of construction for instruments that purport to create servitudes."[12] Our job is to honor the intention of the parties and to give full effect to all of their contractual provisions.[13] In the instant case, the parties' intent that all of the provisions of their contract would bind future owners of their properties is express and clear, and they put third party purchasers on notice. The Wagner/Toro service agreement was duly recorded, on July 10, 1996, before the property's sale to Rael.
La.R.S. 9:2721, the Public Records Doctrine, states, in part: "No ... contract ... or other instrument affecting immoveable property shall be binding on or affect third persons or third parties unless and until filed for registry in the office of the parish recorder of the parish where the land or immoveable is located." This implies that, if a contract is duly recorded, third party purchasers take the property subject to the contract. Indeed, in Meares v. Pioneer *522 Production Corp.,[14] we held that a purchaser of immovable property is charged with knowledge and bound by everything that the public record shows. Thus, under La.R.S. 9:2721, Rael had total and adequate notice that Toro Investment Corporation's contractual obligations and rights, under this contract, went with the property and that Rael would be bound by them, if it purchased the property. If Rael had not wanted to be bound by this contract, it could have declined to purchase the property or, presumably, even negotiated a lower purchase price. However, once it purchased the property, it was legally bound to accept the recorded contract's terms. Since the contract was duly recorded, Rael did not have the option of not assuming the obligation,[15] nor could Toro and Rael agree, without the Wagners' consent, that the contract was not binding on Rael.[16]
Furthermore, although it is irrelevant to whether Rael is legally bound, Mr. Alford, Rael's owner, participated in the confection of this agreement when Toro and the Wagners formulated its terms.[17] Accordingly, he was intimately acquainted with its terms and had more knowledge of the service agreement than that which the public records showed.
At oral argument, Rael seemed to suggest that it should not be bound to the contract because it may not be able to fulfill some of its conditions in the future. For example, it might have to close its golf course and, thus, would not be able to fulfill that condition. This is true of any contract, and should this speculation become fact, the law provides a remedy under La.Civ.Code art. 1873. Furthermore, not enforcing a contract on this speculative basis would render every contract unenforceable. Additionally, Rael seemed to suggest that the contract is invalid because its expiration is indefinite. However, the law provides for this, as well, under La. Civ.Code art. 1778. Moreover, Rael did not assign as error that the contract is invalidonly that it should not be binding on it. Thus, validity is not an issue.
Presumably, the majority designates the obligations, in the instant contract, as personal obligations to support its position that Rael had the option of not accepting the contract and since Rael did not, we cannot enforce the contract against it.
La.Civ.Code art. 1766 establishes the criteria for defining an obligation to be personal:
An obligation is strictly personal when its performance can be enforced only by the obligee, or only against the obligor.
When the performance requires the special skill or qualification of the obligor, the obligation is presumed to be strictly personal on the part of the obligor. All obligations to perform personal services are presumed to be strictly personal on the part of the obligor.
When the performance is intended for the benefit of the obligee exclusively, the obligation is strictly personal on the part of that obligee.
(Emphasis added.)
In the instant case, the most obvious problem with depicting the contractual obligations as personal is the Code's requirement that "the performance is intended for the benefit of that obligee, exclusively." *523 (Emphasis added.) On the contrary, Toro and the Wagners intended for future owners of both of the properties to be bound by the reciprocal obligations, which the contract outlined. In that regard, the contract states, "Services to be binding on all future owners of property." Thus, their intention to bind future property owners negates "exclusivity" and, as such, should defeat the notion that the obligations were personal.
Nevertheless, if we ignore this provision of the article and simply examine the nature of the obligations to determine whether their character is personal, article 1766 speaks of the requirement of a "special skill or qualification of the obligor" as being integral to the definition of a personal obligation. For example, a marriage engagement[18] and a musician's obligation under a contract to record music[19] are personal obligations. Presumably, the other party was willing to contract with these particular people because of the personal attributes, which, only, they could provide. Thus, the obligations are personal.
Conversely, there is nothing personal about, or in, any of the obligations between the contracting parties in the case, sub judice, nor were any of the obligations predicated on either parties' special skill or qualification. Thus, the obligations meet none of article 1766's requirements that are necessary for classification as personal obligations. Furthermore, none of these obligations can be performed without involving the properties at issue. In other words, neither of the parties could fulfill their contractual obligations elsewhere; the obligations are attached to and, thus, should go with the property, especially, given the contract's recordation.[20]
Moreover, the majority never discusses the effects of a properly recorded, valid contract, containing a personal obligation. As noted above, an obligation's classification does not, necessarily, determine whether it is binding on third party purchasers. Given our facts, regardless of the obligation's classification, since it was properly recorded prior to purchase, we must enforce it. This contract is the law between these parties.[21]

APPENDIX A
 To: Mr. & Mrs. Wagner
 From: George GouffrayToro Investment
 Corp.
 Subject: Service Agreement
 Date: February 22, 1996
Per our conversation today, please see below the details of the service agreement Toro Hills Resort/Toro Investment Corporation will honor with Mr. & Mrs. Wagner, Condo 4A and 4B.
Services
1) Present level of services not to be diminished
a. Garbage pickup
b. Sewerage & Water

c. Cable TV & Telephone
d. Upkeep & Maintenance of property
e. Four parking spaces maintained
f. Lifetime golf membership & privileges for family members.
g. Use of personally owned golf cars on golf course

*524 h. Use of all facilities on 265 acres more or less included but not limited to tennis courts, pools, recreation rooms at no additional charges
i. One-half price for motel rooms
j. One-half price for guests golf green fees
k. One-half price for guests golf cart fees
Monthly fee for services will be $75.00 not to increase unless agreed by owner 4A and 4B. Services to be binding on all future owners of property.

* * * * *
(Emphasis added.)
NOTES
[1] These services included garbage pickup, sewerage and water, cable television and telephone, upkeep and maintenance of property, parking spaces, lifetime golf membership and privileges for family members, use of personally owned golf carts on golf course, use of all facilities at no additional charge, one-half price for motel rooms, one-half price for guests' golf green fees, and one-half price for guests' golf cart fees.
[1] See Appendix A.
[2] 5 S. LITVINOFF, LOUISIANA CIVIL LAW TREATISE, THE LAW OF OBLIGATIONS, § 3.25 at 53 (2nd 2001) citing La.Civ.Code art. 2266 of 1870; Louisiana Archives 1236-37 (1942); La.Civ. Code art. 1839; 2 LITVINOFF, OBLIGATIONS 122-24 (1975).
[3] Id. at 53.
[4] See generally, Meares v. Pioneer Prod. Corp., 382 So.2d 1009 (La.App. 3 Cir.1980).
[5] 526 So.2d 1086 (La.1988).
[6] 483 So.2d 972 (La.1986).
[7] La.Civ.Code art. 470, Comment B.
[8] See La.Civ.Code art. 741 as revised in 1977 and amended by La.Acts 1978 No. 479; White v. Durrwachter, 431 So.2d 65 (La.App. 1 Cir. 1983).
[9] Wagner v. Alford, 98-1726 (La.App. 3 Cir. 6/30/99); 741 So.2d 884, 885.
[10] See 4 AN Yiannopoulos, LOUISIANA CIVIL LAW TREATISE, PREDIAL SERVITUDES, § 128 at 370 (2nd ed. 1997); citing La.Civ.Code arts. 730-734 as revised in 1977, id. art. 753-758 (1870); see also, Dautreuil v. Degeyter, 436 So.2d 614 (La.App. 3 Cir.1983); Brown v. Rougon, 552 So.2d 1052 (La.App. 1 Cir.1989), writ denied 559 So.2d 121 (La.1990).
[11] Id. 371 (2nd ed. 1997); citing Noel Estate v. Kansas City Southern & Gulf Railway Co., 187 La. 717, 175 So. 468 (1937); Palgrave v. Tallieu, 508 So.2d 97 (La.App. 5 Cir.1987).
[12] Id. at 370 (2nd ed. 1997); citing La.Civ. Code arts. 730-34 as revised in 1977, id. art. 753-758 (1870); see also, Dautreuil v. Degeyter, 436 So.2d 614 (La.App. 3 Cir.1983); Brown v. Rougon, 552 So.2d 1052 (La.App. 1 Cir.1989), writ denied 559 So.2d 121 (La. 1990).
[13] Ryan v. Monet, 95-1332 (La.App. 4 Cir. 12/28/95); 666 So.2d 711, 714.
[14] 382 So.2d 1009 (La.App. 3 Cir.1980).
[15] La.Civ.Code art. 1839; 2 Litvinoff, Obligations 122-124 (1975); 5 S. LITVINOFF, LOUISIANA CIVIL LAW TREATISE, THE LAW OF OBLIGATIONS, § 3.25 at 53 (2nd ed. 2001).
[16] Meares, 382 So.2d 1009.
[17] Wagner v. Alford, 98-1726 (La.App. 3 Cir. 6/30/99); 741 So.2d 884.
[18] Johnson v. Levy, 118 La. 447, 43 So. 46 (1907).
[19] Fletcher v. Rachou, 323 So.2d 163 (La.App. 3 Cir.1975).
[20] La.Civ.Code art. 1839; LITVINOFF, LOUISIANA CIVIL LAW TREATISE, THE LAW OF OBLIGATIONS, § 3.25 at 53.
[21] La.Civ.Code art. 1983.